71 N.J. Super. 435 (1962)
177 A.2d 284
MARY G. COHRS, PETITIONER-RESPONDENT,
v.
IGOE BROTHERS, INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 20, 1961.
Decided January 15, 1962.
*437 Before Judges GAULKIN, HERBERT and KILKENNY.
Mr. William T. McElroy argued the cause for appellant (Messrs. Shaw, Pindar, McElroy, Connell & Foley, attorneys).
Mr. Samuel A. Larner argued the cause for respondent (Messrs. Budd, Larner & Kent, attorneys).
The opinion of the court was delivered by KILKENNY, J.A.D.
The Division of Workmen's Compensation determined that petitioner was permanently disabled to the extent of 20% of total as the result of a fall at her place of employment and awarded her compensation therefor, besides ordering the payment of hospital and medical bills, as well as medical and legal fees.
On respondent's appeal, the County Court affirmed the award and also allowed petitioner interest at 6% from the date of the Division's judgment on each week's award to the date of entry of judgment in the County Court.
On this further appeal by respondent from the judgment of the County Court, respondent argues that (1) the petitioner *438 failed to sustain her burden of proof; and (2) the County Court erred in allowing interest dating back to the time of the award in the Division of Workmen's Compensation.
The employment relationship, the happening of the accident, due notice thereof to the employer, the nature of petitioner's permanent disability, and the timeliness of her claim petition are not in issue. Nor do the parties argue the correctness of the percentage of disability found by the Division, though petitioner's neurologists gave appraisals of 60% and 25%, as against a figure of 15% of total testified to by respondent's expert. The primary basic dispute is whether there exists a causal connection between petitioner's accident and her disabling condition of multiple sclerosis. Her medical experts swore that there is such a causal relationship and respondent's expert testified to the contrary.
Guided by Russo v. United States Trucking Corp., 26 N.J. 430 (1958), and Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445 (1958), we have made our own independent study of the evidence, giving "due regard to the opportunity of the hearer of the evidence to judge of the credibility of the witnesses" and "full and respectful consideration of the views expressed on both fact and law" by the Division and by the County Court. We note that both tribunals concurred in finding causal relationship and that the deputy director made special mention of the fact that he was impressed by the honesty of petitioner's testimony.

I.
Respondent concedes that petitioner sustained a compensable accident on July 30, 1957, when she slipped and fell on the floor of the office lobby, where she was employed as a switchboard operator and receptionist. She was then 42 years old and had been in the employ of respondent and its predecessor for about nine years prior to that date.
*439 Petitioner's accident was a simple one. As she described it:
"I closed up the board at five o'clock and started to walk towards the front door to go  well  in fact, I was going to the ladies' room first, and I stood for a few minutes talking to one of the girls that was sitting there, and then continued on inside, and then came out to go out the front door.
When I came out, I slipped, I fell down. I turned on my arm and hit the side of my head."
She attributed her fall to the slippery, waxed floor. She explained that she struck the left side of her head, got up and was holding her hand, which started to swell up and hurt her, when the office manager, who was coming down the stairs at the time, came over to her. She stood there a few minutes and then continued on to get a bus over at the corner.
She testified further:
"* * * when I got on the bus I felt kind of funny. * * * I felt dizzy and started to get pain in the side of my face. * * * Left side. * * * and by the time I got home it was all numb to the center of my lip and it was paining me, and the back of my head, and I called Dr. Forte who is my family physician."
Dr. Forte saw her at her home on the day of the accident, was informed that she fell at her place of work, and found objectively, in examining her, "swelling, ecchymosis left side of face and lip, left arm and leg with tenderness." He treated her symptomatically, "put her on analgesics, diathermy to the arm and leg and then * * * gave her Vitamin B12 injections for her numbness she was complaining of in the face." Dr. Forte treated her further on July 30 and July 31, 1957 at her home and thereafter on August 5, 9, 12, 15, 22 and 29, 1957 at his office. While he had not discharged her as cured, she did not return to his office until January 2, 1958, at which time she still had discomfort, pain and numbness on the left side of her face. On the last-mentioned date, he examined *440 her superficially, made a diagnosis of "cerebral concussion, contusion of the left side of the face, head, face and left arm and leg." He found no neurological signs at that time. He prescribed the same medicine, told her to come back, but that was her last visit to Dr. Forte.
On cross-examination, Dr. Forte testified that, at her January 1958 visit to his office, petitioner complained of "swaying" and that he told her it could be the result of her injury, her concussion. He did not regard the swaying as a neurological sign and "didn't pay any attention to that." Dr. Forte had treated Mrs. Cohrs for four or five years prior to her accident, from eight to twelve times a year for "bronchitis, asthma, pleurisy, influenza, colds and menopausal syndrome," but she never complained before the accident of any dizziness, loss of balance, loss of sense of balance, or anything in that category.
Petitioner testified that the swaying and loss of balance first manifested themselves about two months after the accident and that she never had these symptoms prior thereto. She seems to have worked regularly before her mishap and engaged in bowling "maybe once a week with the girls." On cross-examination, she denied making any statements to her doctors that her dizziness and instability in walking had appeared prior to her 1957 accident. She particularly denied having told Dr. Furst or any other doctor who examined her in July or August 1958, or anyone else at East Orange General Hospital when she was there in 1958, that she had noticed dizziness and difficulty in her walking for "two years" prior thereto.
Because she wasn't getting better under Dr. Forte's care and "kept going to the side" when walking, she consulted another physician, Dr. Becker, on June 2, 1958. He verified that she gave him a history of her accident and that on her third visit she told him that "she had this falling over to the left side or pulling over to the left side ever since September, 1957." He gave her a Romberg test and finding positive neurological signs recommended her to Dr. Furst, *441 a neurologist. Dr. Furst saw her for the first time on July 10, 1958 and found that she was ataxic. He advised a more intensive study in an intramural hospital setting.
Petitioner entered East Orange General Hospital on August 3, 1958 and remained until August 22, 1958, during which time there were tests and treatment. There she was observed not only by Dr. Becker and Dr. Furst, but also by Dr. Medinets, a neuro-surgeon, and a Dr. Roh. Dr. Becker diagnosed her condition as a cerebral encephalopathy, causing the disturbance of balance. The neurologists, including Dr. Flicker, respondent's expert, who subsequently examined her and the hospital records, described the condition as a demyelinizing process or multiple sclerosis, permanent in nature but with periods of exacerbation and remission, and disposed toward becoming progressively worse.
On the assumptions of an absence of the symptoms prior to the accident and their manifestation approximately two months after her fall, petitioner's treating physician and treating neurologists stated as their opinion that there was a causal relationship between the accident and the condition of multiple sclerosis. Dr. Furst concluded, on the basis of the foregoing assumptions that "the injury had something to do with the precipitation of the neurological picture." He testified that multiple sclerosis can occur from a virus infection or from an allergic response or a deficiency disease "or it may occur from trauma." Pre-existing viral infections, germ allergies and deficiency diseases, according to Dr. Furst, might have "sensitized the individual's nervous system to the other factor, namely, trauma."
On cross-examination, Dr. Furst admitted that if the onset of the symptoms antedated the accident his opinion of causal relationship would change. In view of that material concession, and the fact that Dr. Medinets first found no causal relationship on the basis of the hospital record which indicated the existence of the symptoms prior to her fall, respondent then adduced the following items of evidence to prove that petitioner's symptoms of multiple *442 sclerosis had their onset prior to July 30, 1957, the date of her accident. First, Dr. Furst testified that he took a personal history from petitioner on his initial examination of her on July 10, 1958 and he then recorded that she told him that she had the symptoms "for the past two years." Second, the history recorded by Dr. Roh in the hospital record on consultation on August 5, 1958 notes:
"Insidious and gradual onset beginning 2 years ago  becoming increasingly severe the past 6-8 weeks * * *."
Third, on July 11, 1958 Dr. Furst wrote to Dr. Becker stating that he had examined petitioner the previous day and that:
"* * * she gave me a 2-year history of dizziness, unsteadiness, not feeling right, inability to see well, falling against doors, and in general has been experiencing a physical decline * * *."
Fourth, the admitting nurse made the following entry on August 3, 1958 in petitioner's hospital record on her admission to the hospital:
"Admitted female to room 420 via wheelchair. Complained of pain in left arm. Has noticeable limp of left side of body. States `My equilibrium is off on my left side. I've had this for a couple of years.'"
These items of evidence created a sharp and vital conflict in the proofs as to when petitioner's symptoms of unsteadiness in gait and dizziness had first manifested themselves. Opposed thereto were her sworn testimony before the Division and that of Dr. Forte and Dr. Becker, as noted above, tending to prove that the symptoms appeared two months after her fall. Since the opinions of her medical experts hinged on the absence of the symptoms before the fall and their first appearance about two months thereafter, resolution of this factual conflict became of prime importance.
*443 Both the Division and the County Court recognized and weighed the conflict in proofs and resolved it in favor of the petitioner. The deputy director, who was in the best position to evaluate the credibility of the witnesses, took pains to record in his findings:
"The petitioner impressed me by the honesty of her testimony. I found no occasion to suspect that she was not forthright and honest in her testimony."
The deputy director concluded that the history notations of Dr. Furst and Dr. Roh were outweighed by her testimony to the contrary and the supporting testimony of Dr. Forte, who had treated her over a period of four or five years before her accident, to whom she never complained of any such symptoms and who never observed them during that time.
The County Court disposed of the adverse notations in the medical entries and the hospital record in these words:
"Reference is made to statements the petitioner is alleged to have made in July and August of 1958 to the effect that certain symptoms had manifested themselves, in the past `couple of years.' These statements are so inexact as to have little probative value. Further, having been made twelve and thirteen months after the accident they appear to have been nothing more than offhand estimations of the duration of the symptoms."
It was only in the hospital entry by the admitting nurse that reference was made to "a couple of years." We agree that that entry, standing alone, would have little probative value for lack of exactness. But we cannot brush it aside lightly when we find it illuminated by the more specific reference to an "onset beginning about 2 years ago," entered by Dr. Roh in the hospital record, and Dr. Furst's testimony and letter of July 11, 1958 in which he noted, "She gave me a two year history of dizziness, unsteadiness, * * *."
Resolution of this grave factual question has not been free from doubt. Opposing inferences contend for recognition. When plaintiff consulted her several doctors for the *444 purposes of treatment and cure, there is a fair inference that she gave them a true history of her symptoms and the doctors made correct entries thereof in their records. The inference is especially compelling when we consider that all of these medical examinations were made before Mrs. Cohrs had any litigation pending. Her claim petition for compensation was filed on November 12, 1958, several months later. Yet, the history first given by petitioner to her personal physician of long standing, Dr. Forte, about five months after the accident, and then to her next treating physician, Dr. Becker, that her swaying or movement to the left side as she walked commenced two months after her accident, is at variance with the history recorded by her later physicians, Dr. Furst and Dr. Roh, if we accept their notations of "two years" literally, which they made in July and August 1958, because the latter would have related the symptoms back to 1956, prior to the accident. Hence, we are required, as was the Division and the County Court, to resolve this apparent conflict in her medical history.
There is also the assumption that the petitioner's sworn testimony was true, that she did not perjure herself. To this must be added the express affirmation of the deputy director in his findings that she was "honest" and "forthright" in her testimony. The admitting nurse's entry, referring to "a couple of years," was lacking in definiteness and was based upon information probably obtained under strained circumstances from a sick, and perhaps somewhat distraught, woman at a time when she was being admitted to the hospital and brought to her room therein "via wheelchair." The nurse was not called as a witness, reliance being placed on the hospital record itself. We find this entry by the nurse to be inconclusive. Dr. Roh also was not called as a witness and the source of the information, upon which his entry was predicated, was not explored. He may have obtained it from the petitioner or by hearsay from others. There is no reason to doubt that Dr. Furst made a true entry in his record, as he understood the situation to be from his conversation *445 with Mrs. Cohrs. However, we must recognize the possibility of a margin for error in the substance of that entry. If her unsteadiness had commenced about September 1957, as she testified and as she had already told two treating physicians before Dr. Furst examined her in July 1958, her difficulty in walking had embraced parts of two calendar years, 1957 and 1958. Her language in describing the time factor to Dr. Furst may have lacked precision, or her memory, dimmed by the lapse of time and her suffering, may have induced a mistaken or erroneous statement. It is significant that Dr. Furst's record does not specifically relate her report of the first manifestations of the symptoms as being prior or subsequent to her fall. We do not feel that more credence should be given to the entries made by Dr. Furst, Dr. Roh and the admitting nurse than to petitioner's statements under oath at the trial, supported as they were by the testimony of her earlier treating physicians, Dr. Forte and Dr. Becker. While the matter is not free from doubt, as noted above, the preponderance of probabilities induces us to resolve the issue in favor of the petitioner for the reasons expressed by the deputy director and his imprimatur as to "the honesty of her testimony," and our own analysis of the evidence.
Dr. Flicker, neurologist engaged by respondent to examine petitioner and to testify as to her condition, expressed the opinion that there was no causal connection between her fall and her subsequent disability. He declared that whether her symptoms first manifested themselves before the date of her fall or two or three months subsequent thereto, there was no causal relationship under either hypothesis. We need not explore his opinion based on the assumption that petitioner's symptoms manifested themselves a year prior to her fall, since her medical experts apparently do not disagree, if that fact be assumed. Moreover, we find, as did the Division and the County Court, that these symptoms probably had their onset about two months after her accident. On the latter basis, Dr. Flicker still felt that petitioner's "demyelinizing *446 process is not associated with the described trauma." It was his view that:
"The only known direct physical trauma that will produce demyelinizing lesion is a violent trauma to the head or spinal cord. It must be trauma of unquestioned violence. Minor traumata do not produce it."
After stressing that "it takes a violent trauma to either initiate or bring it [a latent condition of multiple sclerosis] to the fore," Dr. Flicker asserted that the degree of trauma here could not have produced or accelerated the demyelinizing process because it "was insufficient to produce unconsciousness. That is my only yardstick." He also stated that "where there is an acute emotional disturbance kicking loose the process, there is an immediate onset. It occurs within a matter of hours, certainly within a matter of a very few days," rather than within two or three months, as in Mrs. Cohrs' case.
We have reviewed the conflicting medical opinions and agree with the conclusions reached by both the Division and the County Court that the petitioner sustained the burden of proving by the preponderance of probabilities that there was a causal relationship between the accident in question and her demyelinization or multiple sclerosis.
Whether the condition of multiple sclerosis was caused, precipitated, or accelerated by petitioner's fall, her disability is compensable. For multiple sclerosis cases, in all of which compensation was awarded, see Galloway v. Ford Motor Co., 7 N.J. Super. 18 (App. Div. 1950); Schust v. Wright Aeronautical Corp., 7 N.J. Super. 54 (App. Div. 1950); Sanderson v. Crucible Steel Corp., 3 N.J. Super. 209 (App. Div. 1949); Davis v. Lotz, 126 N.J.L. 615 (Sup. Ct. 1941).

II.
The employer also challenges the propriety of the County Court's allowance of 6% interest "from the date of the *447 judgment of the Division of Workmen's Compensation * * * on each week's award to the date of entry of judgment" in the County Court.
There is no provision in the Workmen's Compensation Act expressly authorizing the County Court to add interest to an award of compensation. The only reference to interest in the statute is R.S. 34:15-28, under which the "bureau" may, in its discretion, add interest at 5% when lawful compensation has been withheld for three months or more. If the paucity of reported cases is any indication, this power has been exercised very sparingly by the bureau. Interest was denied by the bureau in Asbell v. Campbell Morrell & Co., 12 N.J. Misc. 707, 174 A. 344 (Dept. Labor 1934), and Greenhaus v. Essbee Amusement Corporation, 13 N.J. Misc. 656, 180 A. 625 (Dept. Labor 1935), because there was a "bona fide dispute" as to the cause of petitioner's disability, or "a grave factual question," and the employer had not failed to make payment by reason of negligence or other wrongful conduct.
On appeal from the Division, the County Court hears the matter de novo on the record made below. Harrison v. Foster, 51 N.J. Super. 77 (Cty. Ct. 1958); R.R. 5:2-5. In the instant matter, the County Court correctly stated in its opinion, 66 N.J. Super. 526 (Cty. Ct. 1961), that R.S. 34:15-28 "has no bearing on the application" before it for interest. Hence, we need not decide whether the discretion expressly vested in the "bureau" by that statute is impliedly vested also in the County Court, which hears the matter de novo on appeal, because the County Court did not rely upon the exercise of any such discretion in allowing interest in this case. See Atamanik v. Real Estate Managament, Inc., 21 N.J. Super. 357, 365 (App. Div. 1952), upholding the County Court's discretion in denying interest on a compensation award. Parenthetically, if discretion were the factor in issue here, we would deny interest for the same reasons expressed in the Asbell and Greenhaus cases, supra.
*448 In this case, the County Court allowed interest on the award at 6% on the broader concept that the issue was "controlled by principles relating to the matter of interest on judgments." It is true that judgments of our courts do bear interest at 6% from the date of entry, but that is a matter of usage, not of statute. Simon v. N.J. Asphalt & Paving Co., 123 N.J.L. 232 (Sup. Ct. 1939); Erie Railway Co. v. Ackerson, 33 N.J.L. 33 (Sup. Ct. 1868); Verree v. Hughes, 11 N.J.L. 91 (Sup. Ct. 1829). Is the determination of the Division of Workmen's Compensation a "judgment," or so much its equivalent as to be entitled to the benefit of that usage? It is referred to as a judgment in N.J.S.A. 34:15-58, N.J.S.A. 34:15-66 and R.R. 5:2-5, and deputy directors who preside at the hearings are now called "judges." Such determinations by the Division have some qualities inherent in judgments, such as the attribute of res adjudicata. Estelle v. Board of Education of Red Bank, 26 N.J. Super. 9, 25 (App. Div. 1953); Hull v. Hercules Powder Co., 20 N.J. Misc. 168, 171, 26 A.2d 164 (Sup. Ct. 1942); Temple v. Storch Trucking Co., 29 N.J. Super. 492 (Cty. Ct. 1954).
On the other hand, decisions of administrative agencies are not normally regarded as judgments in the technical sense of that term because they are not formal adjudications of an established court. Thus, an award by the Division of Workmen's Compensation is not enforcible by writ of execution, until it is converted into a judgment of a County Court by being docketed with a county clerk. N.J.S.A. 34:15-58. Compare a District Court judgment, enforcible by writ of execution against personal property even before docketing, though docketing is necessary to make it a lien against land. The constitutional power of the Supreme Court under the New Jersey Constitution of 1947, Art. VI, Sec. V, par. 1(d), to review directly by certification the judgment of all inferior courts does not extend to decisions of administrative agencies. *449 Mulhearn v. Federal Shipbuilding and Dry Dock Co., 2 N.J. 356 (1949).
Furthermore, if an injured employee dies from a noncompensable cause during the period of payments for permanent disability and is not survived by dependents as defined in the Workmen's Compensation Act, the remaining amount due is not an asset of his estate, to be enjoyed by his creditors and next of kin, as would be the case of an unsatisfied judgment of a law court. Instead, recovery of the remaining amount due is limited by N.J.S.A. 34:15-12(e) to a sum not exceeding $400 to be paid to a proper person for his funeral expenses.
The County Court cited Simon v. N.J. Asphalt & Paving Co., supra, in support of its opinion, but there the employee was allowed interest on the unpaid installments of compensation only from the time the "judgment of the bureau" was docketed. There was no claim of interest prior to the docketing and the court particularly noted that fact, thus indicating a long standing view, unaltered by subsequent decisions, that the bureau's award does not bear interest unless it is added by the bureau under R.S. 34:15-28, or the bureau's determination is docketed with the county clerk pursuant to N.J.S.A. 34:15-58.
The County Court stated (66 N.J. Super., at p. 527) that "the allowance of interest, at least from the date of the award in the Workmen's Compensation Division, would seem to be inferentially approved in Kasiski v. International Paper Co., 31 N.J. 267 (1959)." We find such an inference very dubious, particularly since Kasiski involved an interpretation of the Bureau's discretionary power to allow interest under R.S. 34:15-28, which statute the County Court found "has no bearing on the application" before it for interest. The Supreme Court decided merely that the deputy director erred in allowing interest on the award commencing three months after the date of decedent's death and should have, under the facts of that case, allowed interest only from the *450 date when the last determination in favor of the petitioner was made in the Workmen's Compensation Division.
We find no New Jersey statutory or case authority supporting the County Court's allowance of interest at 6% on the undocketed award of the Division from the date of the decision of the Division. As stated in Agnew Co. v. Paterson Bd. of Education, 83 N.J. Eq. 49, 67 (Ch. 1914), affirmed o.b. 83 N.J. Eq. 336 (E. & A. 1914):
"Unless a case be found which is conclusive authority establishing a precedent, the safest way for a court of law or equity is to decide all questions pertaining to interest according to the plainest and simplest considerations of justice and fair dealing."
Guided by that principle, we conclude that the interest allowance was erroneous and unwarranted, particularly in this "bona fide dispute" as to the cause of petitioner's disability, where "a grave factual question" was involved.
The County Court's judgment awarding compensation is affirmed but its allowance of interest is reversed. No costs to either party.