276 N.J. Super. 636 (1994)
648 A.2d 743
RICHARD A. WIGGINS, PETITIONER-RESPONDENT,
v.
THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1994.
Decided October 28, 1994.
*637 Before Judges SHEBELL, SKILLMAN, and KLEINER.
George P. Cook argued the cause for respondent-appellant (Hugh H. Welsh, Deputy General Counsel, of counsel; Christopher J. Neumann, on the brief).
D. Gayle Loftis argued the cause for petitioner-respondent.
The opinion of the court was delivered by KLEINER, J.A.D.
Respondent Port Authority of New York and New Jersey appeals from a judgment in the Division of Workers' Compensation awarding petitioner Richard A. Wiggins one hundred percent total permanent disability. The judgment characterized the award as "permanent aggravation of pre-existing multiple sclerosis and associated depression, neurological and psychiatric in nature. Petitioner is totaled from the neurological disability alone."
*638 In a review of a decision of a workers' compensation judge, the general rule is that we will only decide whether the findings made could reasonably have been reached on "substantial" or "sufficient credible evidence present in the record," considering the proof as a whole. Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965). After careful review of this record and particularly the medical evidence presented, we conclude that there was insufficient credible evidence considering the proofs as a whole to support the court's award. Accordingly, we are constrained to reverse the judgment.
At trial, petitioner testified that he was then fifty years old and had been employed by respondent from March 29, 1966 until his retirement on disability on January 16, 1989. Petitioner had been assigned to various facilities in a janitorial capacity from 1966 to 1985. In 1985, he was assigned as a grounds attendant at the Newark Airport, where he worked closely with the gardener and was exposed to pesticides, insecticides and herbicides. In November 1985, he was promoted to a "trades helper" position to perform gardening. His responsibilities included cutting grass, planting seed, pulling weeds and applying fertilizer and other chemicals to the grounds and shrubs surrounding the airport. Respondent stipulated that petitioner had been exposed to milorganite Greens Keeper; Surflan and Treflan, pre-emergent weed killers; Round-up, a post-emergent weed killer; benlate; fungicide; Sevin, a beetle pesticide; dormant oil and bug spray. Working outside, petitioner was also exposed to temperature extremes.
In 1975, petitioner was diagnosed with multiple sclerosis. Since 1981, he was hospitalized on three occasions for complications related to his multiple sclerosis, including "blurry vision" and "wobbly legs." After his assignment to the gardener position, petitioner experienced discomfort when the temperature exceeded seventy-five degrees or dropped below forty degrees for a period of three hours. Petitioner's testimony was offered to establish an occupational disease within the purview of N.J.S.A. 34:15-31(a), which defines occupational diseases as those "arising out of and in *639 the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment." Ibid. (Emphasis added.)
Because respondent stipulated that petitioner is totally and permanently disabled, at issue was the causal link between: plaintiff's emotional stress, occupational exposure to chemicals, and temperature variations; and the exacerbation of his multiple sclerosis. As noted, petitioner had the burden to prove this causal link by a preponderance of the evidence. "All that is required is that the claimed conclusion from the offered fact must be a probable or a more probable hypothesis.... The test is probability rather than certainty." Hercules Powder Co. v. Nieratko, 113 N.J.L. 195, 203, 173 A. 606 (Sup.Ct. 1934) (citation omitted), aff'd, 114 N.J.L. 254, 176 A. 198 (E. & A. 1935).
There is precedent for an award of compensation or damages for the aggravation of pre-existing multiple sclerosis by trauma. See Galloway v. Ford Motor Co., 7 N.J. Super. 18, 71 A.2d 657 (App.Div.), aff'd, 5 N.J. 396, 75 A.2d 855 (1950) (compensation for heavy lifting accident that activated dormant MS); Cohrs v. Igoe Bros., Inc., 71 N.J. Super. 435, 177 A.2d 284 (App. Div. 1962) (compensation for slip and fall, blow to head that activated dormant MS); Schust v. Wright Aeronautical Corp., 7 N.J. Super. 54, 71 A.2d 894 (App.Div.) certif. denied, 5 N.J. 177, 74 A.2d 376 (1950) (compensation for fall from chair that activated dormant MS); Sanderson v. Crucible Steel Corp., 3 N.J. Super. 209, 66 A.2d 188 (App.Div. 1949) (compensation for blow to spine that aggravated MS); Davis v. Lotz, 126 N.J.L. 615, 20 A.2d 602 (Sup.Ct. 1941) (compensation for fall from ladder that aggravated MS); Woodle v. Sullivan, 19 N.J. Misc. 458, 21 A.2d 151 (N.J.Dept. of Labor 1941) (compensation for fall that aggravated MS). Although each of the cited cases involved trauma, theoretically there is no reason to deny compensation where a petitioner proves that occupational conditions contribute in a material degree to the aggravation or exacerbation of multiple sclerosis. N.J.S.A. *640 34:15-31(a) has been extended to an employee burdened with pre-existing diseases or conditions. Giambattista v. Thomas A. Edison, Inc., 32 N.J. Super. 103, 107 A.2d 801 (App.Div. 1954). The claimant must demonstrate that "conditions characteristic to the occupation ... contributed in a material degree to [the] disability." Peterson v. Hermann Forwarding Co., 267 N.J. Super. 493, 504, 631 A.2d 1274 (App.Div. 1993), certif. denied, 135 N.J. 304, 639 A.2d 303 (1994).
The evidence at trial was limited to petitioner's testimony, the admission of petitioner's medical records since 1975, and the conflicting expert testimony of two examining physicians.
Petitioner presented Dr. Paul Kiell, a Board Certified psychiatrist whose private practice is essentially psychiatry.[1] He has treated multiple sclerosis patients for psychiatric disease but has never treated multiple sclerosis. Dr. Kiell has evaluated claimants and those examinations were predominantly neurologic in nature.
Dr. Kiell evaluated petitioner on January 5, 1990 and on January 13, 1993. In comparing these evaluations, he found constancy in the degree of petitioner's disability. He concluded that occupational exposure either aggravated, accelerated or exacerbated petitioner's multiple sclerosis. Dr. Kiell's testimony ascribed three occupational facts which aggravated petitioner's multiple sclerosis: stress at work, exposure to toxic substances and exposure to temperature variations.
Petitioner referred in his testimony to two specific instances of stress at work. He related an event in which he perceived he was being subjected to racial discrimination by fellow employees and an occasion when he discovered a dead body within the Lincoln Tunnel. Dr. Kiell testified: "It's rational to assume that any nonspecific stress of work can aggravate the underlying condition." That theory was explored on cross-examination as follows:

*641 Q Now, Doctor, are you aware of any studies or matters in your field, in the field of neurology, regarding the effect of emotional stress on MS patients?
A I'm aware, without citing any article, but I have read in the literature, and it is generally accepted, that emotional stress, and for the reason I gave before, does have an effect on the permeability of the blood brain barrier, therefore making the person more vulnerable to damage to the central nervous system which, if it is already present, would make him more vulnerable to any toxin invading the central nervous system.
In his findings, the judge of compensation concluded that the causal relationship between stress of work and the exacerbation of petitioner's condition had not been proven.
Dr. Kiell opined that extreme temperatures can cause relapses of multiple sclerosis. Although he could not cite any medical literature to support this opinion, he did cite evidence in petitioner's medical records that in August 1987 and August 1988, when petitioner suffered relapses in his condition resulting in his hospitalization, the Newark geographic area experienced high temperatures. Petitioner also testified that he was extremely uncomfortable when the temperature exceeded seventy-five degrees or when he worked outdoors for more than three hours in temperatures below forty degrees. Dr. Kiell did not testify as to the extent to which temperature extremes affect multiple sclerosis, nor did he testify as to the duration of any changes in that medical condition.
The third basis for Dr. Kiell's opinion pertained to petitioner's exposure to chemicals. As with his opinion on stress and temperature variations, he could not cite any medical literature in support of that opinion. He predicated his opinion on information gathered in his general medical training and to information gleaned from "Silent Spring," a non-fiction publication by Rachel Carson. On cross-examination, the following illustrated the deficiency in the witness's opinion:
Q Okay. So, did you come up with any articles or periodicals, monthly periodicals, that indicate that they would exacerbate an MS?
A No. I am not contending that they.
Oh, yes. I am contending that.
I don't think, I'm saying that there is nothing in the literature, I doubt that there is anything specific in the literature, to say that it exacerbates an MS.

*642 I don't know offhand.
I'm saying that it does, it is damaging to the central nervous system.
Now, just ... I do have one.
I just want to see one thing.
(Refers to papers) I have a list of, I don't have articles, I had a list of articles.
But well, I think that answer[s] your question, so go on.
Q Do you know of any other chemicals that you can give examples of that accelerate or exacerbate MS?
A In, not chemicals but it's also thought to be, MS is thought to be, either an allergic, if you will, reaction to something within the person, an autobody or an autoimmune disease, and in some individuals they have found that certain wheat products will trigger it and, if you avoid that, the person can do very well.
Q M,hm.
A What this shows is that external agents can aggravate the condition.
So again, it's reasonable that an agent that is damaging to the central nervous system would certainly be implicated in aggravating the condition, not in causing it.
Q If it's reasonable that it would be implicated, is that the general consensus of the medical thought and opinion?
A That is among people that I have spoken to.
Q The people you have spoken to.
A Yeah, neurologists.
Q How many people have you spoken to regarding it?
A How many, over the years?
I can think offhand of at least a dozen neurologists.
In another instance, Dr. Kiell was specifically asked to explain his conclusion and to distinguish the natural progression of multiple sclerosis from a progression of the disease aggravated, accelerated or exacerbated by chemical exposure.
Q Is there any way that you are able to distinguish between the central nervous system damage caused by MS and the central nervous system damage that is caused by pesticides?
A I can't tell the difference in a person with MS.
Finally, this witness indicated that petitioner's condition could have been exacerbated solely by natural causes.
Respondent relied upon the opinion of Dr. Ivan Dressner, a Board Certified physician in neurology and psychiatry. Not only has Dr. Dressner treated approximately seventy-five patients for multiple sclerosis, but he has offered evidence in litigation involving claims that trauma aggravated pre-existing multiple sclerosis.
*643 Dr. Dressner indicated that there is no scientific basis for the contention that general stress, chemical exposure, or temperature variations can exacerbate multiple sclerosis. He did a thorough check of medical literature, including the use of a computer database, and concluded:
[T]here is not a report of a case, except a single case of chlordane exposure in a person where they developed Multiple Sclerosis and died some years [] later....
So, in other words, the only report of a pesticide in the literature, in the English speaking world, in the last 30 years, which I have reviewed through the computer yesterday, was that report on chlordane, the conclusion of which was  chlordane had nothing to do with it and the man died from Multiple Sclerosis.
Dr. Dressner indicated that exposure to chemicals affects those with multiple sclerosis no differently than the remainder of the population. "[I]f a pesticide gives you a neurotoxic effect in sufficient doses, then the person with MS would be no more likely to have it harm him than the patient who didn't have it."
Dr. Dressner also refuted the opinion offered by Dr. Kiell that temperature variations affect multiple sclerosis. He indicated that he had personally performed studies on patients with multiple sclerosis to determine the affect of temperature variation. He concluded that temperature variation can temporarily affect symptoms, but the patient's symptoms cease when the patient is returned to a normal temperature. He therefore concluded that petitioner's employment did not affect the progression of his pre-existent condition.
Preparatory to its ruling, the court referred to petitioner's expert, Dr. Kiell's testimony:
Doctor could not identify any medical literature that specifically supports his position in this case.
He is relying on his general medical knowledge that toxins are contra-indicated and are damaging to the central nervous system without any specific literature indicating causing or aggravating multiple sclerosis.
He did indicate that medical libraries and consulting computers have literature on it, but he apparently is not aware of anything existing therein favorable to his position in this matter.
He doubts if there is anything very specific in the literature saying that these exposures would aggravate multiple sclerosis.
*644 However, despite the absence of any independent medical support for Dr. Kiell's opinion, the court inexplicably concluded that petitioner's multiple sclerosis had been aggravated and exacerbated by his exposure to chemicals and temperature variations. The court stated: "[W]e have a man working who had underlying Multiple Sclerosis, and ... he is exposed to herbicides and pesticides which are unfriendly, to say the least, to the neurological system and, therefore, he is more prone to a reaction because his system is already weakened."
The court proceeded to weigh the testimony and concluded:
[W]hile it is true we do not have any experiential studies dealing with aggravation of Multiple Sclerosis by the type of exposures involved in this case, this Court cannot overlook the analysis of Dr. Kiell that there probably was some aggravation and acceleration of his underlying condition from the exposures described over the years with this respondent.
....
The Court gets the definite impression that there was a high degree of exposure and over a fairly lengthy period of time in the warm seasons each year.
....
There is certainly some doubt in this Court's mind as to whether these exposures did cause an acceleration of the petitioner's underlying Multiple Sclerosis, but the Court is persuaded by the preponderance of the medical expert testimony in this matter that there was.
Although the judge cited Hellwig v. J.F. Rast & Co. Inc., 110 N.J. 37, 538 A.2d 1243 (1988) in support of his determination of compensability, we read Hellwig as supportive of respondent's position.
[A]n expert witness's conclusion ... should be carefully evaluated in the context of both the statutory criteria and prevailing medical standards.... Compensation judges should be particularly skeptical of expert testimony that supports or contests a finding of causation on the basis of reasoning inconsistent with prevailing medical standards.
[Hellwig, supra, 110 N.J. at 54, 538 A.2d 1243.]
In this case, petitioner did not provide any objective medical or scientific evidence establishing a causal link between chemical exposure and temperature variations and the exacerbation of his multiple sclerosis. We do not consider Dr. Kiell's reference to "Silent Spring" and his conclusion predicated on that book that *645 exposure to any chemical in almost any quantity can be harmful, as constituting reliable objective evidence that chemical exposure can and did exacerbate petitioner's multiple sclerosis. In fact, petitioner's expert indicated that his multiple sclerosis appeared constant when comparing his 1990 evaluation with his 1993 evaluation.
The absence of any specific objective evidence here is similar to the deficiency of proof discussed in Fiore v. Consolidated Freightways, Inc., 270 N.J. Super. 520, 637 A.2d 578 (App.Div. 1994), certif. granted, 137 N.J. 165, 644 A.2d 613 (1994). In Fiore, we rejected a claim by a truck driver that his cardiovascular disease was caused by exposure to carbon monoxide in diesel exhaust. One deficiency in proof was noted as the absence of objective evidence of the amount of carbon monoxide generally found in diesel exhaust. Here, petitioner offered no evidence respecting the extent of his exposure to chemicals other than a general description that he was required to use some chemical each day. Although petitioner asked the court to take judicial notice of the New Jersey Department of Health Hazardous Fact Sheets for Sevin, benlate and carbaryl, respondent objected, and the court reserved its decision on the objection. However, the court never revisited the issue. Dr. Kiell did not allude to the information in his testimony.
From the medical testimony offered, it appears that the exact cause of multiple sclerosis is unknown. The disease generally lasts thirty to forty years, its symptoms ebb and wane, and it is progressive. Each recurrence leaves the patient less healthy than during the last period of remission. This is a natural deteriorating progression. The proofs in this case were insufficient to allow a conclusion that chemicals and exposure to temperature variations accelerated or exacerbated plaintiff's deteriorating progression.
The judgment is reversed.
NOTES
[1] Dr. Kiell testified on February 16, 1993.