708 A.2d 742

IRENE KICZULA, PETITIONER-RESPONDENT, v. AMERICAN NATIONAL CAN CO., RESPONDENT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 31, 1997—Decided April 14, 1998.

Before Judges DREIER, KEEFE and PAUL G. LEVY.

*Lora V. Northen,* argued the cause for appellant (*Capehart & Scatchard,* attorneys; *Ms. Northen,* of counsel; *Alison M. Nissen,* on the brief).

*Craig H. Livingston,* argued the cause for respondent (*Ball Livingston,* attorneys; *Mr. Livingston & Lynne P. Kramer,* of counsel; *William J. Volonte,* on the brief).

The opinion of the court was delivered by

PAUL G. LEVY, J.A.D.

In this workers' compensation case, petitioner Irene Kiczula received a fifty percent permanent partial disability award when the trial judge found that her pulmonary disease, known as Wegener's granulomatosis (WG), was exacerbated or aggravated by her employment on an assembly line that made steel cans. The employer, in this appeal, challenges the sufficiency of the evidence to prove that petitioner's work accelerated or aggravated the disease. We disagree with the employer's arguments and accordingly, we affirm.

Petitioner filed a claim with the Division of Workers' Compensation, contending that during her employment with respondent she was exposed to "dust, fumes, and other deleterious substances" and had therefore suffered injury to her lungs. The judge found that petitioner had a fifty percent partial total disability and granted a judgment for payment of $170 per week for 300 weeks.

In 1973, petitioner began work with American National Can Company. She worked in the "assembly department," in which aerosol cans were made. Throughout her time there, petitioner

noted "a lot of fumes, lot of odor, smell, a lot of different [odors] that would, you know, aggravate your breathing." These fumes would come from the solder and from the solvents that were being used, including methyl ethyl ketone or MEK. Other departments of the company would also generate fumes that could be smelled at her work station.

Petitioner's description of the work environment was corroborated by Ulysse Perry, a 38–year retired employee of respondent. He stated that the air quality in the plant was poor, due in part to the obstruction of windows in the plant, and ventilation was also generally ineffective. Certain "extremely hazardous" solvents could not be handled unless wearing gloves, and they also added to the air contamination at the plant. A supervisor in the department where petitioner worked, Lou Ferraro, testified and disputed some of petitioner's descriptions of the work environment.

Although she did not want to, petitioner was forced to stop working in November 1984 when she was first admitted to the hospital for gynecological problems. She worked again in June 1985 and then from October 1985 to August 1986. The reason she had to stop working at those various times was because she couldn't breathe properly, was weak, and experienced wheezing and coughing. Her medical problems have included pain in her feet, legs, chest, arms, and back, general weakness, and difficulty breathing. She still cannot walk far or be active long without becoming fatigued.

The WG was first discovered in a December 1984 hospital visit. The previous month, petitioner had been in the hospital, but no pulmonary problems were observed then. In being treated for the WG, she had various hospital stays from 1984 to 1986; her trachea was replaced in December 1986. The disease is now in remission. Petitioner notes she has never smoked nor does she have allergies.

Dr. Jeffrey Nahmias, testifying for the petitioner, said that petitioner told him of the various fumes to which she was exposed throughout her work for respondent. Dr. Nahmias reported that

in December 1984, an open lung biopsy procedure was done on petitioner, which led to the diagnosis of the Wegener's granulomatosis. The disease affected her sinus, nose, trachea, lungs, and upper and lower airways. She was put on medication, including Cytoxan, which caused various side effects, ultimately requiring that petitioner discontinue its use. This potentially life-threatening disease was treated with some success, and by November, 1995, her lower airways showed significant improvement even though her upper airways remained troubled. He thus noted that the condition was permanent. The doctor also opined that the disease was not *caused* by petitioner's exposures at work.

Significantly, however, the doctor reported that "her symptoms of nose and eye burning, wheeze, shortness of breath, cough, weakness, et cetera, were very much aggravated at the job site and that these symptoms were much less present on the weekend at home away from her job site." Ultimately, asked whether her work conditions exacerbated or accelerated the disease, the doctor replied that "I think most certainly it was exacerbated and the whole lung disease processes sped up by exposure to the chemicals and dusts at work." After reviewing a hypothetical example which tracked the petitioner's testimony about the conditions of her workplace, the doctor confirmed that to a reasonable medical probability, there was a causal link, not between the job and the disease itself, but between the job and the "severe exacerbations" of the disease. He did note, however, that petitioner seemed to have no pulmonary problems during her first eleven years on the job.

Dr. Nahmias explained with some specificity why he linked petitioner's job with the exacerbation of her disease. He stated that both the petitioner's description of the sequence of her symptoms, as well as the changes in clinical findings he made over the course of time, supported this view.

> The most important thing hearing from the patient was about the significant improvement when she was away from the job; like on the weekends her breath was much easier, less cough, less wheeze, less dyspnea, although, don't get me wrong, it was still present but it was certainly most exacerbated while on the job.

> Over the course of time ... the pulmonary function studies have shown traumatic [sic: probably "dramatic"] improvement especially of the lower airways....

The doctor also referred to medical journal articles concerning WG. He reviewed these articles to help treat the patient; by reviewing them, he was able to learn the current state of knowledge about the disease. He emphasized that the etiology of the disease is unknown. Nor is it exactly known what environmental factors will exacerbate symptoms in WG patients. However, for patients with inflammatory lung diseases (of which WG is one), exposure "to nonspecific irritants will show exacerbation often ... of their disease process." He explained:

> Any patient with inflammatory disease of the upper or lower airways will have a non specific hypersensitivity reaction of the upper and lower airways. These patients also when they are exposed to outside toxins will experience increases in symptoms of cough, wheeze, shortness of breath, tightness of chest and that is why often they can't be near these pollutants. Toxin exacerbates their condition. If they are in a much more cleaner environment, not exposed to it, the disease might still be there but they are not going to have this exacerbation of symptomatology.

Dr. Douglas Hutt countered with testimony for the respondent. He emphasized that the cause of WG is unknown. There is "no evidence to suggest that certainly any workplace environments are related to the development of this disease." Moreover, WG is not listed as an occupational disease in any of the accepted texts on the subject. In addition to there being no evidence that a workplace causes this disease, there is also no evidence that workplace exposures exacerbate the disease, or otherwise affect the development or progression of the disease. As such, Dr. Hutt opined that there would be no change in the progress of the disease whether or not she worked at this site. In sum, his reasonable medical opinion was that this workplace neither caused nor exacerbated this petitioner's disease.

The workers' compensation judge found for petitioner, and awarded her a fifty percent partial total disability, finding that pulmonary irritants peculiar to the place of employment materially exacerbated and aggravated the Wegener's granulomatosis from which she suffered. He found that her witness' description of the

workplace was more credible than that of the respondent's witness. He next found there was a causal link between the workplace irritants and her medical condition, as he explained in his written decision:

> I note that both Dr. Nahmias who testified for the petitioner, and Dr. Hutt, who testified for the respondent, stated that the precise cause of Wagner's granuloma [sic] is unknown. Dr. Hutt hypothesized that it was either viral or microbial. Dr. Hutt maintained that the course of petitioner's disease was not affected by her employment at American National Can. On the other hand, Dr. Nahmias felt that it was, and he based his opinion upon the fact that there was a steady worsening of her condition during the period that she was exposed to the pulmonary irritants, specifically in 1984, 1985 and 1986. I note that Dr. Hutt, when asked by petitioner's attorney whether it was a good idea for the petitioner to return to the kind of environment where she was working after her condition went into partial remission, I thought that he hedged in his answer. He did not seem to think it was a good idea that petitioner go back to that kind of a work environment, even though he said it would not affect the course of her condition.

The judge then focused on the apparent timing of the disease's symptoms, noting that petitioner's complaints of symptoms were less during times when she was not working, and that objective evidence showed improvement of her condition the longer she was away from her work:

> What made sense to me was the fact that Petitioner's condition did actually improve after she got out of this work environment and she seems to be doing considerably better now that she has remained out of the work environment. I found Dr. Nahmias more persuasive for that reason. If the course of the disease is unaffected ... or not exacerbated by exposure to pulmonary irritants, why has she not had any significant problems in the last few years that she has been out of the environment? I am satisfied, therefore, the exposure in the work area impacted on her disease process and pushed it along faster than it would have gone had she not been working in the place where she was. Therefore, I am satisfied that we are dealing with a disease that was exacerbated by employment. I am satisfied that the fumes to which Mrs. Kiczula was exposed were peculiar to her particular place of employment. I am satisfied that her condition qualifies as a compensable occupational disease as that term is defined by statute.

■ In this case, the judge determined that the WG from which petitioner suffered was an occupational disease that was materially aggravated and exacerbated by conditions characteristic of and peculiar to petitioner's employment. *See N.J.S.A.* 34:15–31. Respondent argues, however, that these findings did not satisfy the three-pronged test of *Fiore v. Consolidated Freightways*, 140 *N.J.*

452, 659 *A.*2d 436 (1995). Both petitioner and respondent agree that *Fiore* requires proof of these elements:

> [1.] [T]he petitioner must show that the disease is due in "a material degree" to causes "arising out of the workplace that are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment."
>
> ■ [T]he petitioner must prove "by suitable medical evidence that the employment exposure did indeed cause or contribute to the disease" [especially when there are competing theories about the causal agent].
>
> ■ [T]he petitioner must show that the employment exposure substantially contributed to the development of the disease.
>
> [*Id.* at 472–73, 659 *A.*2d 436].

Here, the issue is whether the severity of symptoms suffered by petitioner are due to the natural progression of the disease or to workplace exposures. Thus, the *Fiore* framework for evaluating which among competing possibilities caused these exacerbated symptoms, is still appropriate. *See id.* at 466, 659 *A.*2d 436. This requires presentation of reliable evidence about the work environment, *id.* at 476, 477, 659 *A.*2d 436, as well as objective medical evidence connecting the disease to the work. *Id.* at 475, 659 *A.*2d 436 (citing *Wernowski v. Continental Can Co.*, 261 *N.J.Super.* 269, 618 *A.*2d 882 (App.Div.), *certif. denied*, 133 *N.J.* 437, 627 *A.*2d 1142 (1993)).

We have previously emphasized that environmental conditions at a work site must *materially* contribute to the aggravation or exacerbation of disease to be compensable. *Wiggins v. Port Authority*, 276 *N.J.Super.* 636, 639–40, 648 *A.*2d 743 (App.Div. 1994). In *Wiggins,* the employee claimed that exposure to chemical pesticides on the job exacerbated his pre-existing disease, multiple sclerosis (MS). MS, like the disease in question here, is of an unknown cause. The court there described the petitioner's testimony about exposure to chemicals as being a mere "general description that he was required to use some chemical each day." *Id.* at 645, 648 *A.*2d 743. In the medical testimony there, the petitioner's doctor conceded the absence of any medical literature linking chemical exposure to MS symptoms. However, based on his "general medical training" and the book *Silent Spring* by Rachel Carson, the doctor concluded that "exposure to chemicals

in almost any quantity can be harmful." *Id.* at 644–45, 648 *A.*2d 743. The doctor also conceded that he could not distinguish between nervous system damage in a person with MS as being caused by either the disease or by exposure to chemicals. *Id.* at 642, 648 *A.*2d 743.

We found this testimony to be insufficient to establish a causal link between the workplace chemical exposure and MS, a disease of unknown origin which is progressive and whose symptoms "ebb and wane." *Id.* at 645, 648 *A.*2d 743. However, the present case is distinguishable.

■ Turning first to the petitioner's testimony about the work-site, the testimony here was far less generalized than it was in *Wiggins*. It referred to specific chemicals and was related how each of those chemicals would cause symptoms that could be felt by petitioner. Although there was no study of the precise concentration of particles in the air of the plant, the fact remains that the different types of pollutants were all identified here and their qualitative effect on petitioner was discussed and subject to cross-examination.

■ In addition, the quality of medical testimony was superior in this case. First, petitioner's expert was a board-certified pulmonary specialist testifying about pulmonary diseases. He is testifying directly within his field of specialized knowledge, unlike the psychiatrist in *Wiggins* who was testifying about multiple sclerosis, something outside his area of specialized knowledge. More importantly, though, he did not simply assert that his "general medical training" suggested a link between these chemicals and WG. Rather, he established that WG was part of a class of lung diseases known as hypersensitivity disorders. He then related the effects of pollutants on sufferers of such diseases. While the medical literature made no such link between WG *itself* and pollutants, the evidence supported a link between hypersensitivity disorders and pollutants. Thus, this aspect of the testimony was far more specific that in *Wiggins*. Finally, petitioner's doctor here has evidence about causation from the timing of the disease

and its symptoms, something not present in *Wiggins*. Specifically, the doctor here noted improvement of the disease on weekends, when petitioner was away from work. More importantly, clinical findings have shown that the longer petitioner has been away from her work, the more her lungs (especially the lower airways) have improved. This correlation between time spent at the workplace and the severity of the disease provides a reasonable basis for making inferences about the disease's cause. In fact, evidence of the timing of symptoms has been specifically recognized as a competent way of studying causation; "the manner in which the disease developed, with reference to the claimant's medical and work history" is entirely appropriate for the court to consider. *Fiore, supra*, 140 *N.J.* at 473, 659 *A.*2d 436 (citing *Rutledge v. Tultex Corp./Kings Yarn*, 308 *N.C.* 85, 301 *S.E.*2d 359, 372 (1983)).[1]

The other major Appellate Division case discussed by the parties is *Laffey v. Jersey City*, 289 *N.J.Super.* 292, 673 *A.*2d 838 (App.Div.), *certif. denied*, 146 *N.J.* 500, 683 *A.*2d 202 (1996), decided after *Fiore*. The case involved a police officer whose duties included working in a "very dusty" police station with a broken furnace that would generate fumes. In addition, his job included working outdoors, where he was exposed to fumes from vehicles, fires, and landfills. The court described this evidence as being insufficient "subjective characterization[s]" without information on the level of pollution, types of pollution, or duration of exposures. *Id.* at 306, 673 *A.*2d 838.

We also noted deficiencies in the medical testimony there, for example, there were no medical articles that "link[ed] exposure to fumes from vehicles, furnaces, landfills, or fires to petitioner's

---

[1] *Rutledge* has some similarities to this case; it involved a claimant who contracted an obstructive pulmonary disease of unknown origin. She claimed the disease was caused or exacerbated by her work in textile mills and exposure to cotton dust, while the respondent claimed that her cigarette smoking and recurrent bronchitis caused the disease. The case discusses the legal standards to evaluate her claim for workers' compensation under North Carolina law.

ailments." *Ibid.* Thus, his testimony on causation was based "solely on the subjective characterizations of the petitioner and not on an existing medical, epidemiological, or scientific studies establishing causation." *Ibid.* In sum, the award overturned in that case was based on "conjecture" and not on "cautious, reasoned probabilities." *Id.* at 308, 673 *A.2d* 838.

The present case is stronger than *Laffey*, just as it is stronger than *Wiggins*. The testimony here listed the specific pollutants to which petitioner was exposed, and discussed the duration of exposures. True, no studies of air quality or the like were done, but there was certainly more than mere subjective characterizations. In addition, the medical testimony was also stronger. A medical article discussed here specifically theorizes that WG is a kind of hypersensitivity disorder and states that many researchers consider it to be "aggravated by inhalation of an environmental agent or agents." In sum, taking into account these theories of the disease's cause, and noting that the petitioner was much better once she was removed from the source of the pollutants in question, i.e. her workplace, it is not merely conjecture to connect the job and the disease. Rather, it is a inference based on a "cautious, reasonable probability," *Laffey, supra,* at 308, 673 *A.2d* 838, and supports the award made by the judge of compensation.

We must affirm the decision of a judge of workers' compensation if the findings made by the judge could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, and giving due regard to the opportunity of the trial judge to assess the credibility of witnesses. *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.2d* 753 (1965). It is the petitioner's burden to establish a causal link between the employment and the disease. *Laffey v. Jersey City, supra,* 289 *N.J.Super.* at 303, 673 *A.2d* 838. The link must be proven by a preponderance of the evidence; "all that is required is that the claimed conclusion from the offered facts must be a probable or more probable hypothesis.... The test is probability rather than certainty.... However, the evidence must be such as

to lead a reasonably cautious mind to the given conclusion. It need not have the attribute of certainty, but it must be well founded in reason in logic; mere guess or conjecture is not a substitute for legal proof." *Ibid.* (citations and quotations omitted).

There was sufficient credible evidence in the record, consisting of petitioner's description of her workplace and the expert medical testimony she presented that allowed for the inference of a connection between the workplace and her illness.

Accordingly, the judgment is affirmed and the stay we previously granted is vacated.