289 N.J. Super. 292 (1996)
673 A.2d 838
PATRICK LAFFEY, PETITIONER-RESPONDENT,
v.
CITY OF JERSEY CITY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 11, 1996.
Decided April 10, 1996.
*295 Before Judges HAVEY, D'ANNUNZIO and BRAITHWAITE.
JoAnn Katzban, Assistant Corporation Counsel, argued the cause for appellant (Sean M. Connelly, Corporation Counsel, attorney; Ms. Katzban on the brief).
Michael J. Dillon argued the cause for respondent (Horn, Shechtman & Hirsch, P.C., attorneys; Mr. Dillon on the brief).
The opinion of the court was delivered by BRAITHWAITE, J.A.D.
Respondent, City of Jersey City, appeals from a workers' compensation judgment awarding petitioner, Patrick Laffey, thirty-seven and one-half percent permanent partial disability for pulmonary disease. We reverse.
Petitioner, fifty-four years of age at the time of his compensation hearing, was employed by respondent as a police officer from 1973 until August 1994, when he retired. He was assigned to the police station located at 576 Communipaw Avenue for his entire tenure as a Jersey City police officer. Petitioner described the station building as a three story structure containing administrative offices, the captain's office, a cell block or holding cell, the Detective Bureau, a bathroom, storage lockers, and a locker room with a changing area. The building also had a basement that *296 contained the furnace and fuel tank, telephone lines, and plumbing.
Petitioner characterized the building as "a really old building, very dusty." He attributed the dusty condition to the casement windows that "don't really shut." The windows face Communipaw Avenue, which he identified as "the main truck and bus thorofair [sic]." He also claimed the building had "the original furnace in the building from when they built it so there is [sic] tremendous fumes ... [that] [w]ould come up to the main floor." He further asserted that the wood floors in the looker room were not cleaned on a regular basis and would "hold all the residue and dirt." Petitioner testified that he would spend "[o]n an average day ... about a half hour before and then maybe a half hour, twenty minutes to a half hour after [shift] changes" in the locker room. When asked how much time he spent in building "working the desk," petitioner responded:
Well, you did everything out of your building. You got your assignments out of this building. If you had a report, you go out and get a report, you would have to come back and type on the first floor. If you had an arrest, you had to expedite the arrest on the first floor because all the [] paperwork had to be signed by the supervisor. So really a great deal of time could be spent there at different times of the day.
When petitioner first joined the police force he was assigned to foot patrol. That assignment mostly entailed supervising school crossings and traffic control. He was assigned to the Hudson Mall and Route 440 area. Describing the working conditions, petitioner testified as follows:
Q. What would the conditions be like while you were working that job?
A. During the day heavy traffic, mostly trucks down there.
Q. What would the air be like where you were working?
A. Well, the air down there wasn't very good because the PJP Land Fill was active all this time.
Q. Describe how that would affect where you were working?
A. Well, PJP would emanate ashes, smoke, sometimes really heavy, sometimes lighter. It all depends. Mostly in the summertime it was very heavy.

*297 ....
Q. What else would be in that area when you were working near PJP?
A. Mostly truck traffic, fumes, dust from dust [sic] and dirt from the road. In the middle there is like an island. When it would rain it would just go into the road.
In 1976, petitioner was reassigned to motorcycle duty. He described his duties as "ke[eping] Communipaw Avenue clear in the morning so that the trucks and buses could come across town, respond[ing] to some fires, d[oing] some school crossings, traffic control[, and] [i]f there was [sic] spills, we would take care of those." Describing the working conditions, petitioner said, "a lot of times they would have the road open for construction so it [sic] would be a lot of dirt and pipe work, dust from that, fumes from the buses, fumes from the trucks, fumes from the cars."
Petitioner testified to the frequency of responding to fires and the conditions at the scenes as follows:
Q. Can you estimate during that period of time how many [fires] you responded to?
A. Winter time it was heavy, maybe two a week.
Q. What would the conditions be like at the fires?
A. Well, we would get there right away. It would be really heavy smoke, ash, your body could be covered. Your uniform would be covered with all this ash.
Q. Did you have any duties to stay at the fire while it was being extinguished by the fire department?
A. You would be there for traffic control, crowd control and you would probably be there assigned somewhere near the house after the fire until they can get the house shield up and the building shield up so no one would go in and steal stuff out of it.
Q. What would the conditions be like while the fire was being extinguished?
A. A lot of ash, debris being tossed off the roof, out of the windows and things like that. Stuff that is burning, furniture and things like that.
Q. Did you have a mask while you were doing that?
A. No, we never signed [sic] a mask.
Q. What would the conditions be like after the fire was extinguished while you were securing the area?
A. It would be lighter smoke.
Q. There would still be smoke there?
A. Yes. There would still be smoke there.
Q. After?
A. After you've done a fire, you go back to the precinct and change uniforms.

*298 Q. Would anything ever get on your hands or face at a fire scene?
A. When you finished you went back and you usually washed up. They would give you time to go wash. You just tell them you were going to go change and wash and get the stuff off of you.
After four and a half to five years on motorcycle patrol, petitioner was reassigned to plain clothes undercover investigations. He was assigned to plain clothes investigation for "one almost two years." He would sit in an unmarked vehicle to catch people illegally dumping waste. The area of surveillance extended from Communipaw Avenue and Route 440 to the Pulaski Skyway including the area in and around the PJP Landfill. Petitioner testified, "[s]ummer time was the hardest because ... the air just wouldn't go anywhere."
For the next eight years of petitioner's career, he was assigned to radio car patrol. Petitioner's duties included routine patrol, responding to fire scenes, directing traffic, and monitoring school crossings. The conditions petitioner experienced during this eight year period were the same as on prior assignments involving the same duties.
Petitioner's last two years were spent in the precinct house the entire time. He stated the conditions were the same as when he started with the department. He testified "nothing was ever fixed."
During the last twelve years of his employment with the police department, petitioner also ran a video taping business from his home. Upon his retirement from the police force in August 1994, petitioner began operating the taping business full time, working forty to fifty hours per week. Petitioner video tapes weddings, depositions and other events interested parties want taped or documented.
Petitioner testified that he has difficulty going to locations to set up his video cameras because he "gets out of breath easily." He cannot climb stairs because he gets out of breath. Moreover, he testified to an inability to exercise as he did prior to his current *299 condition, and an inability to participate in recreational activity with his fifteen year old son.
Petitioner had not been hospitalized in the ten years prior to his hearing. Furthermore, he had not received medical treatment for his pulmonary ailments. He testified that he was treated by his family doctor for a cold, but his complaint of shortness of breath was attributed to the cold.
He described his current ailments as follows: "[u]sually in the morning I'll wake up and I'll have maybe some phlegm, slight cough, which I still have. Occasionally I have a cough, shortness of breath." He testified he has noticed these symptoms for ten years.
Petitioner does not smoke. Petitioner's wife did smoke, and occasionally she smoked in the house. However she has not smoked in ten years. Petitioner suffers from allergies to pollen, however, he does not take medication for this condition.
Petitioner's expert witness, Dr. Henry Velez, M.D., examined petitioner on March 2, 1992, and again on November 2, 1994. Dr. Velez elicited the following symptoms and complaints from petitioner:
He stated to me that he was suffering from a productive cough and which had been in his opinion had been worsening since he had first note of it and also shortness of breath after going up two flights of stairs. His past medical history or family history were not significant. He had graduated high school in 1958. He served his country with the United States Army and that he worked as a musician. He entered police duties in 1968 working in the state capital. In 1973 he began working for the City as a police officer. He never smoked. He had allergies to pollen, was not taking any medication.
Dr. Velez took a chest x-ray of petitioner. The only significant finding was "moderate to severe increase in bronchovascular markings." Dr. Velez also performed a pulmonary function study. He testified that the study indicated: "obstruction of the small airways, had borderline value to the FEV[1] over the FVC[2] and *300 normal forced vital capacity, increased restrictive disease." Following the March 2, 1992 examination, Dr. Velez concluded: "[b]ased on his history of cough, the x-ray findings and the pulmonary function testing, I diagnosed chronic bronchitis, peri-bronchial fibrosis and small airway disease." At that time, Dr. Velez assessed petitioner's disability at "thirty percent of total and permanent."
During petitioner's second examination on November 2, 1994, Dr. Velez noted the only change in circumstances was petitioner's retirement two months prior. Petitioner made no claim of changed symptoms. The second x-ray, again, indicated moderate to severe increase in bronchovascular markings. "The pulmonary function tests showed a decrement in function with actually some improvement in overall volume." Following this second examination, Dr. Velez assessed petitioner's disability at thirty-seven and one half percent of total and permanent.
In response to petitioner's counsel's question concerning causal relationship, Dr. Velez testified as follows:
Q. And based on the facts as outlined in the hypothetical question taken together with your medical examinations and the findings, do you have an opinion within a reasonable degree of medical probability whether there is any causal relationship between petitioner's work for the City and his overall assessment of disability and pathology that you found?
A. It would be my opinion that his findings as stated by me were causally related to his exposures and his employment for the City of Jersey City.
Q. Can you take us through your analysis of why you find that to be the case?
A. Well, he was a long time employee from 1973, basically over 20 years, a lot of traffic duties, a lot of excess exposures, diesel fumes, bus fumes, truck fumes, auto fumes. Also I believe that he also has responded to various and numerous fire scenes again causing him smoke inhalation. Those were his basic exposures.
Dr. William Burke, M.D., respondent's expert, examined petitioner on June 25, 1992, and found the following:
Physical examination was normal. The electrocardiogram was normal, chest x-ray was normal and pulmonary function studies revealed 92 percent vital capacity, 91 percent FEV, 99 percent ratio and 83 percent FEF and no disability was appreciated at that time.
On January 12, 1995, Dr. Burke again examined petitioner and found the following:

*301 Vital signs were normal as they were previously. Physical examination was normal. Electrocardiogram was normal. Chest x-ray was normal and the pulmonary function studies revealed 98 percent, oxygenation 120 percent, vital capacity 106 percent, FEV 88 percent ratio, and 65 percent FEF 25-75.
Dr. Burke, opined: "I did not feel that there was any evidence that this gentleman in fact had obstructive airways disease and I did not find any pulmonary disability."
The Compensation Judge, after hearing the evidence made the following findings:
[Petitioner] was headquartered at the west district in a building which was such that he was subjected to dust and oil fumes coming from the furnace room, the dirt and dust in the locker room from wooden floor. [Petitioner] would direct traffic at the busiest intersections of the city as well as doing school crossing work and ... was exposed to fumes from vehicles that were passing. He would work at construction scenes and be exposed to dirt that was thrown around at the time. He would respond to fire scenes and would be exposed to the smoke and ash from the fires as well as the dust and dirt from debris. He was assigned to illegal dump control and petitioner would have to sit at the dump site in order to observe the illegal dumping so that the arrests could be made.
The Compensation Judge further "noted that the petitioner during the course of his testimony before me coughed and cleared his throat on repeated occasions. Dr. Velez testified that during the course of his examination he observed the petitioner to cough repeatedly and I find the petitioner was a totally credible witness."
In addition the Compensation Judge opined:
Essentially the petitioner's various exposures consisted of those to which he was subjected by reason of his close proximity to traffic, his close proximity to fires, his close proximity to dust and dirt, and his close proximity to dump sites.
While it is true that the general public who drive cars on the highways are subject to fumes from traffic, the degree of exposure are reflected in the testimony of the petitioner and the combination of exposures as reflected in that same testimony are sufficient to convince me that the conditions to which the petitioner was subjected were characteristic of his place of employment and peculiar to his occupation.
While each one individually may not fit the specific definition, all of them together are a part and parcel of the petitioner's work duties.
In finding that petitioner's employment was the causal agent for petitioner's claim, the compensation judge stated:
The only exposures that have been established by direct or cross-examination are those which were directly related to petitioner's employment.

*302 The medical proofs clearly shows [sic] that the petitioner's disability was caused solely by these exposure, and, therefore I find petitioner has satisfied the material degree requirement which is a degree substantially greater that de minimus having found that the petitioner is suffering from an occupational disease.
The judge's ultimate finding was "permanent disability, pulmonary in nature, for the residuals of a chronic bronchitis with small airway disease and chronic obstructive pulmonary disease to the extent of thirty-seven and one-half percent of partial total entitling [petitioner] to 225 weeks of compensation at $245 per week or $55,125."
On this appeal, respondent makes the following legal arguments:
POINT I
THE STANDARD OF REVIEW IS WHETHER THE FINDINGS OF JUDGE BOLSTEIN WERE BASED ON SUBSTANTIAL CREDIBLE EVIDENCE IN THE RECORD.
POINT II
PETITIONER HAD THE BURDEN OF PROOF IN SHOWING OBJECTIVE EVIDENCE OF SUFFICIENT EXPOSURE IN THE WORKPLACE TO CAUSE AN OCCUPATIONAL DISABILITY.
A. The Burden Was on the Petitioner to Prove the Elements of His Case.
B. Petitioner Laffey Was Required to Prove by Objective Evidence that His Disease Arose Out of and in the Course of His Employment and Was Due in a Material Degree to His Occupational and Place of Employment.
POINT III
PETITIONER LAFFEY FAILED TO PROVIDE OBJECTIVE EVIDENCE THAT HIS WORKPLACE WAS A MATERIAL CAUSE OF PULMONARY DISEASE.
A. Patrick Laffey Failed to Prove that He was Exposed to Substances in the Workplace which are Known to Cause Lung Disease.
B. Patrick Laffey Failed to Prove by Objective Medical Evidence that the Employment Exposure Caused or Contributed to an Occupational Disease.
C. Petitioner Laffey has Failed to Prove by Objective Medical Evidence a Functional Restriction of the Body its Members or Organs that has Resulted in Either an Appreciable Impairment of his Ability to Work or his Ability to Engage in the Ordinary Pursuits of Life.
1. Judge Bolstein erred in finding sufficient demonstrable objective medical evidence of a compensable lung disease.
2. Petitioner Laffey failed to show substantial impairment of his ability to engage in the ordinary pursuits of life.
*303 The standard of appellate review in a workers' compensation action is
the same as that on an appeal in any non-jury case, i.e., "whether the findings made could reasonably have been reached on sufficient credible evidence present in the record," considering "the proofs as a whole," with due regard to the opportunity of the one who heard the witnesses to judge of their credibility. And in the case of agency review, with due regard also to the agency's expertise where such expertise is a pertinent factor.
[Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965) (quoting State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)).]
Due weight must be given to the expertise of a compensation court judge. Harbatuk v. S & S Furniture Systems Insulation, 211 N.J. Super. 614, 620, 512 A.2d 537 (App.Div. 1986).
For petitioner to prevail he must establish a link between his disease and occupational conditions. "[P]etitioner ha[s] the burden to prove this causal link by a preponderance of the evidence. `All that is required is that the claimed conclusion from the offered facts must be a probable or a more probable hypothesis.... The test is probability rather than a certainty.'" Wiggins v. Port Auth., 276 N.J. Super. 636, 639, 648 A.2d 743 (App.Div. 1994) (quoting Hercules Powder Co. v. Nieratko, 113 N.J.L. 195, 203, 173 A. 606 (Sup.Ct. 1934)), aff'd, 114 N.J.L. 254, 176 A. 198 (E. & A. 1935). However, "[t]he evidence must be such as to lead a reasonably cautious mind to the given conclusion. `It need not have the attribute of certainty, but it must be well founded in reason and logic; mere guess or conjecture is not a substitute for legal proof.'" Lister v. J.B. Eurell Co., 234 N.J. Super. 64, 72, 560 A.2d 89 (App.Div. 1989) (quoting Ciuba v. Irvington Varnish and Insulator Co., 27 N.J. 127, 139, 141 A.2d 761 (1958)).
Therefore we must determine whether there is sufficient credible evidence on this record to establish that petitioner's disability is one compensable as an occupational disease. If there is insufficient credible evidence considering the proofs as a whole to support the compensation court's award, "we are constrained to reverse the judgment." Wiggins v. Port Auth., supra, 276 N.J. Super. at 638, 648 A.2d 743.
*304 N.J.S.A. 34:15-31 defines a "compensable occupational disease" as follows:
a. For the purposes of this article, the phrase "compensable occupational disease" shall include all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process, or place of employment.

b. Deterioration of a tissue, organ or part of the body in which the function of such tissue, organ or part of the body is diminished due to the natural aging process thereof is not compensable.
[(Emphasis added).]
Though the term "material degree" is not defined in a general sense in the statute, it is defined in N.J.S.A. 34:15-7.2 which addresses claims for compensation due to cardiovascular or cerebral vascular diseases. Therein, "material degree" is defined as "an appreciable degree or a degree substantially greater than de minimis." Ibid. We have previously applied the definition of "material degree" in N.J.S.A. 34:15-7.2 to claims arising under N.J.S.A. 34:15-31. See Peterson v. Hermann Forwarding Co., 267 N.J. Super. 493, 504, 631 A.2d 1274 (App.Div. 1993). See also Perez v. Pantasote, Inc., 95 N.J. 105, 116, 469 A.2d 22 (1984).
N.J.S.A. 34:15-36 defines "disability permanent in quality and partial in character" as a "permanent impairment caused by a compensable ... occupational disease, based on demonstrable objective medical evidence. ... [O]ccupational disease of a minor nature such as ... mild bronchitis shall not constitute permanent disability within the meaning of this definition." Ibid. (emphasis added).
After a careful review of the record and in light of applicable law, we conclude that petitioner's case has two fatal flaws. First, petitioner failed to show that the conditions surrounding his work environment were peculiar to his employment. Second, petitioner failed to demonstrate with objective medical evidence that his ailment is related to exposure to the environment as the result of his employment. Several cases demonstrate these flaws.
In Wernowski v. Continental Can Co., 261 N.J. Super. 269, 618 A.2d 882 (App.Div. 1993), petitioner claimed physical and psychological *305 injuries due to aluminum toxicity as a result of his employment. Petitioner's blood tests revealed aluminum levels of ninety-two micrograms per liter, with the normal range being from two to twenty-five micrograms per liter. However, the Compensation Judge rejected the doctor's opinion of causation "because the doctor did `not know what the air quality was at the plant.'" Id. at 272, 618 A.2d 882. Petitioner's only evidence of plant conditions was his testimony that "the plant [was] `very misty, cloudy' and observed dust particles on his clothing and skin on a daily basis. On occasion he detected silver dust particles in his mucus." Id. at 271, 618 A.2d 882. The Compensation Judge found that "although petitioner may have had elevated levels in his blood, there was no evidence of aluminum poisoning" caused by the work environment. Id. at 272, 618 A.2d 882.
We affirmed the Compensation Judge's determination that petitioner did not suffer from a compensable physical injury due to work exposure to aluminum. Ibid. Moreover, in remanding the case for further determination of causation with respect to the psychiatric injury we instructed the compensation court that "[t]he issue is whether there is objective evidence that the repetitive stimuli, viewed realistically, were `peculiar' to the work place. If so, there must be competent objective, medical evidence that the ... disorder is `due in a material degree' to the repetitive workplace stimuli." Id. at 275, 618 A.2d 882. (quoting N.J.S.A. 34:15-31).
Similarly, in Wiggins, supra, 276 N.J. Super. 636, 648 A.2d 743, petitioner claimed exacerbation of pre-existing multiple sclerosis as a result of employment related exposure to certain chemicals and extreme temperatures. In reversing the compensation court's award we held that "petitioner did not provide any objective medical or scientific evidence establishing a causal link between chemical exposure and temperature variations and the exacerbation of his multiple sclerosis." Id. at 644, 648 A.2d 743. Moreover, "petitioner offered no evidence respecting the extent of his exposure to chemicals other than a general description that he was *306 required to use some chemicals each day." Id. at 645, 648 A.2d 743.
Lastly, in Fiore v. Consol. Freightways, 140 N.J. 452, 659 A.2d 436 (1995), rev'g 270 N.J. Super. 520, 637 A.2d 578 (App.Div. 1994), petitioner, a smoker, filed a workers' compensation action claiming coronary disease due to excessive exposure to carbon monoxide fumes as a result of his employment as a truck driver. Though the Supreme Court reversed our decision on procedural grounds, it affirmed our reasoning that:
Where the exposure is related to toxic fumes, the test called for would translate to requiring proof that the exposure was in excess of that ordinarily encountered in every day living; that it arose out of and in the course of employment, and that it was due in material degree to causes peculiar to the particular employment.
[140 N.J. at 460, 659 A.2d 436 (quoting Fiore, supra, 270 N.J. Super. at 542, 637 A.2d 578).]
The Supreme Court further instructed that "the parties should adduce reliable scientific evidence about exposure to fumes in the workplace." Id. at 476, 659 A.2d 436. Furthermore, "[t]o satisfy the requirement that the occupational disease arose out of his employment, [petitioner] must show that his work exposed him to greater risks that those in his daily life." Id. at 477, 659 A.2d 436.
Here, petitioner has done no more than offer subjective characterization about his work environment. He has failed to provide quantitative evidence concerning the level of pollution he was exposed to, the component elements of the pollution, or the duration of exposure in any measurable manner. There was no evidence of any articles, treatises or medical studies that link exposure to fumes from vehicles, furnaces, landfills, or fires to petitioner's ailments. Petitioner's expert's testimony of a causal relationship was based solely on the subjective characterizations of the petitioner and not on any existing medical, epidemiological, or scientific studies establishing causation. "[T]he mere assertion of reasonably probable contributory work connection by a medical witness cannot justify an award. The facts of the situation under examination in their totality must demonstrate causality by the greater weight of the credible evidence." Dwyer v. Ford Motor *307 Co., 36 N.J. 487, 494, 178 A.2d 161 (1962). We are satisfied that Dr. Velez has asserted a causal relationship without credible foundation. Moreover, although the Compensation Judge found that Dr. Velez testified to observing petitioner cough repeatedly during the doctor's examination, we are unable to find any such testimony from Dr. Velez in the record. Furthermore, petitioner presented no scientific evidence that police officers as a class, or even Jersey City police officers as a sub-class, are more particularly prone to exposure to the environment than any other resident or employee of Jersey City.
In concluding that the environmental exposures were employment related, the Compensation Judge relied on testimony from police officers and fire fighters in other compensation cases. He stated:
This petitioner's case is part of a number of cases brought by police officers and fire fighters of the City of Jersey City and I have heard testimony from other police officers and their testimony essentially has a similarity about it and that is that when they are assigned to patrol duties, they perform similar functions and they have all described similar exposures. They perform in buildings where their headquarters are and the description of the conditions in these buildings is similar.
Therefore, when considering whether the petitioner has satisfied the burden of the statute, I find that the totality of the testimony given by the petitioner is such that the nature of the exposures were characteristic of his employment and peculiar to the City of Jersey City.
While we agree that compensation judges are afforded latitude in conducting hearings, reliance on the testimony in other cases is improper. N.J.R.E. 201(b) states that:
Facts which may be judicially noticed include (1) such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute, (2) such facts as are so generally known or are of such common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute, (3) specific facts and propositions of generalized knowledge which are capable of immediate determination by resort to sources whose accuracy cannot reasonably be questioned, and (4) records of the court in which the action is pending and of any court of this state or federal court sitting in this state.
In RWB Newton Assoc. v. Gunn, 224 N.J. Super. 704, 710-11, 541 A.2d 280 (App.Div. 1988), we held that it was improper for the trial court to base its ruling on the contents of certifications the *308 court found in a court file pertaining to a different though related matter. We held that it may be acceptable to take judicial notice of the mere fact that the certification was filed or even of what was alleged in the certification, assuming its relevance. However, we firmly held that a trial court could not take notice of the truth of the contents of certifications merely because they were part of a court proceeding. Ibid.
Here, where there was a significant question as to whether petitioner presented sufficient evidence to establish a credible scientific or even quantitative basis for causation, the Compensation Judge's reliance on other cases was improper. It appears that the Compensation Judge, by relying on the mere existence of other cases, sought to ascribe some credibility to those claims and establish exposure to the environment at large as an occupational hazard for police officers.
Where an employee seeks to recover on an occupational disease because of exposure to the general environment to which the rest of the public is also exposed, the employee must present sufficient, credible, objective evidence that will raise the compensation court's determination from one of conjecture to one of cautious reasoned probability. Here, petitioner's proofs were insufficient to justify an award on an occupational disease basis.
The judgment of the Division of Workers' Compensation is reversed.
NOTES
[1] Forced Expiratory Volume in the first second.
[2] Forced Vital Capacity.