731 A.2d 1196 (1999)
323 N.J. Super. 1
Donald MAGAW, Petitioner-Respondent,
v.
MIDDLETOWN BOARD OF EDUCATION, Respondent-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued June 16, 1999.
Decided July 2, 1999.
*1198 John H. Geaney, Mount Laurel, for respondent-appellant (Capehart & Scatchard, attorneys; Mr. Geaney, of counsel; Jody L. Wiedemann, on the brief).
Michael E. McGann, for petitioner-respondent (Amdur, Boyle, Maggs & McGann, attorneys, Eatontown; Mr. McGann, of counsel and on the brief).
*1199 Before Judges BAIME, A.A. RODRIGUEZ and LEFELT.
*1197 The opinion of the court was delivered by LEFELT, J.S.C. (temporarily assigned).
Donald Magaw was a physical education teacher in the Thorne Middle School, Middletown, New Jersey for 26 years. Magaw claimed in a workers' compensation case that he contracted tonsil cancer from a colleague's second-hand cigarette smoke. A workers' compensation judge agreed with Magaw and concluded that Magaw's tonsil cancer was a compensable occupational disease. The compensation judge also directed the Middletown Board of Education (Board) to pay Magaw past and future medical expenses, temporary disability benefits and attorney fees. The judge also directed the Board to reimburse all accumulated sick time used during his disability period. The Board appealed from the Workers' Compensation Judge's decision. We affirm the compensability determination but reverse and vacate the sick time directive.
On September 7, 1995, the first trial day in this matter, Magaw was fifty-one years old. Neither Magaw nor his wife smoke. Magaw, who suffered from asthma, has never smoked and, when he can, avoids all environments with people who smoke. He never chewed tobacco and has never lived with anyone who smokes. When Magaw worked at summer jobs, he was never exposed to cigarette smoke. Neither of Magaw's parents smoked. Furthermore, Magaw's alcohol consumption is quite minimal-he has no more than two alcoholic drinks a year. At work, however, Magaw shared an office with a chain smoking co-worker, Robert Anderson.
Magaw and Anderson shared this office from 1968, when Magaw was hired, until the end of the 1994 school year, when Anderson retired. The office, a small interior room 15 feet by 9 feet by 8 feet high, with no window or direct access to outside air, was also shared with two other teachers. After Magaw's complaint, the State Department of Health inspected the room and did not find any apparent health hazard. Magaw's desk was within an arm's length of Anderson's. Anderson smoked every time he did not have direct contact with students, between every class and during lunch break and free periods. At times during Magaw's career, he and Anderson shared one or two free periods and lunch. When together in the room during these shared periods or lunch and between classes, Anderson would smoke. Magaw believed that Anderson smoked a pack of cigarettes a day in Magaw's presence. Anderson thought he would smoke about two cigarettes during each of his free periods and probably smoked on average one-half pack, or ten cigarettes, per day.
Another teacher who shared the room testified that Anderson smoked at every opportunity. It was an "automatic thing" with him. "He would light up sometimes and I don't even know why he would light up." He would light up, leave the cigarette there as he worked and puff every now and then. When the co-worker came to work in the morning, he noted that the room smelled of smoke from the previous day. "Bobby Anderson was a good person but he always had that problem of smoking. We were all around it all the time."
In February 1994, Magaw developed an inflammation of his left tonsil, minor swelling and a sore throat. A CT scan failed to show any major abnormality and Magaw was treated conservatively with a powerful antibiotic until the swelling subsided. When the inflammation returned in September of 1994, Magaw had a biopsy performed which led to his cancer diagnosis.
Magaw underwent surgery at Mt. Sinai Hospital on November 2, 1994, and he remained in the hospital for about 17 days. Besides removing the squamous cell carcinoma in his left tonsil, the surgeon partially removed his jaw and mouth. Squamous cell carcinoma is the type of cancer that *1200 usually develops in the lining of tissues. The surgeon also removed a bone from Magaw's leg and reconstructed his jaw using a skin graft from his right leg and muscle tissue from his left arm. The surgical procedure went through Magaw's neck and the shoulder area, which has limited Magaw's shoulder mobility. Magaw has scars on his face and neck into the collar bone area on his left arm. His left leg has a long scar where they removed the bone, and he has scarring on his right leg where they removed the skin graft.
After Magaw's hospital admission, he began radiation therapy around January 1995 at Monmouth Medical Center for five days a week. His radiation therapy ended the first week in March. Magaw then in December 1995 commenced physical and speech therapy.
The Board contested that Magaw's cancer was work related and, therefore, declined to pay him any temporary disability benefits. He utilized sick time up until March 15, 1995.
Dr. Kornmehl treated Magaw at Monmouth Medical Center and testified on his behalf. Dr. Kornmehl earned her medical degree in 1984 and is a board certified radiation oncologist who has treated several hundred patients with head and neck cancer. From 1994 to 1997 she was Chief of Radiation Oncology at Monmouth Medical Center and has been an investigator with the National Cancer Institute.
Dr. Kornmehl explained that the classic risk factors for head and neck carcinoma are tobacco and alcohol exposure. In Dr. Kornmehl's experience, "virtually everybody" with squamous cell carcinoma of the head and neck had risk factors from either or both smoking and alcohol. In adults who neither smoke nor drink, cancers of the mouth and throat are rare or nearly non-existent. She agreed, however, that the data do not exist to make a case for second-hand smoke as a cause of head and neck malignancy and that the Surgeon General has not released any report indicating that second-hand smoke causes tonsil cancer.
Dr. Kornmehl further testified that tobacco smoke was a class A carcinogen which means that it is a direct cause, rather than a promoter, of cancer. She explained that second-hand smoke contains essentially all of the carcinogenic and toxic agents that have been identified in inhaled smoke, but the concentrations in second-hand smoke are at greater levels. She concluded within a reasonable degree of medical probability that Magaw's tonsil cancer was caused by "occupational exposure to second-hand smoke." Dr. Kornmehl explained that Magaw's case was the first case of tonsil cancer she saw where the patient was a non-smoker.
She believed that a 1997 study entitled Squamous Cell Head and Neck Cancer in Non-Smokers supports her view that non-smoking patients who were exposed to environmental tobacco smoke had a significantly higher risk of developing squamous cell carcinoma of the head and neck. She explained her ultimate opinion by stating that the cause of Magaw's cancer was second-hand smoke exposure because she could not identify any other known cause for his cancer and "using logic knowing that primary smoke causes lung cancer and head and neck cancers and secondary smoke causes lung cancers, even though there is no data to show that secondary smoke causes head and neck malignancy, by inference it makes sense second-hand smoke will cause malignancy."
Dr. Cohen, who graduated from medical school in 1954, testified for the Board and disagreed with Dr. Kornmehl. He is board certified in internal medicine and medical oncology. Currently, he is Director of Medical Oncology at Newark Beth Israel Medical Center. He has treated approximately 1200 patients with head and neck cancer during his career. He believed that there was no causal relationship between Magaw's tonsil cancer and his exposure to second-hand smoke.
*1201 Dr. Cohen agreed that in 85% to 90% of the cases, alcohol and cigarette smoking combined are the main risk factors for squamous cell carcinoma of the tonsil as well as other head and neck cancers, but he testified that he has seen patients who had tonsil cancer and did not smoke. He agreed that there is evidence that second-hand smoke may play a role in causing lung cancer, but there is no such data for head and neck cancers. He further explained the importance of oral hygiene as a risk factor, the problem with infectious organisms, and the fact that the use of mouthwash with alcohol could impact on head and neck cancers.
Dr. Cohen also interpreted the squamous cell study differently from Dr. Kornmehl. He said the article shows that the incidence of tonsil cancer in non-smoking patients exposed to cigarette smoke of a partner or in the work place was almost exactly the same as the incidence of tonsil cancer in their controls and that the difference was not significant. Therefore, in his view, there continues to be no medical study which suggests a causal relationship between second-hand smoke and tonsil cancer.
The compensation judge concluded from the evidence presented that it was probable that Magaw's cancer arose out of and in the course of his employment and was due in a material degree to causes and conditions which were characteristic of or peculiar to his particular place of employment. The judge found that Magaw shared a stuffy small room with a chain smoker for twenty-six years during which time he was exposed to second-hand smoke on a continuous basis. The judge believed that Anderson would have smoked approximately 46,800 cigarettes in that inadequately ventilated office, where the pipes above Anderson's ashtray were stained by cigarette smoke. The judge believed such conditions were peculiar to Magaw's place of employment.
The compensation judge also concluded that the medical evidence supported the causal relationship Magaw alleged. He accepted Dr. Kornmehl's opinion and noted that Dr. Cohen "did not testify that second-hand smoke did not cause Mr. Magaw's tonsillar carcinoma. Rather, Dr. Cohen testified that there have been no studies performed which would indicate that there is such a causal link." Therefore, the judge ordered the Board "to reimburse [Magaw's] health insurance carrier all medical expenses incurred by Mr. Magaw with regard to the treatment of his tonsillar cancer ... [and Magaw or] his health insurance carrier [for] all medical expenses incurred by Mr. Magaw with regard to the diagnosis and treatment of his tonsillar cancer." The judge also ordered the Board "to provide future medical treatment that may be required for the tonsillar cancer .... to pay Mr. Magaw his temporary disability benefits from October 26, 1994 until September 7, 1996 at the rate of $460 per week." The judge also ordered the Board "to reimburse Mr. Magaw all of his accumulated sick time that was used during his period of disability ... [and] to reimburse ... those individuals who donated their sick time to Mr. Magaw during his period of disability."
The Board appealed from the Workers' Compensation Judge's decision and claimed, basically, that the judge erred by finding a causal relationship between Magaw's employment and his tonsillar cancer and by ordering reinstatement of sick days.

I.
N.J.S.A. 34:15-30 provides in pertinent part: "[C]ompensation for personal injuries... by any compensable occupational disease arising out of and in the course of... employment, as hereinafter defined, shall be made by the employer...." N.J.S.A. 34:15-31 defines and limits compensable occupational diseases which arise out of and in the course of employment to those "which are due in a material degree to causes and conditions which are or were *1202 characteristic of or peculiar to a particular... place of employment."
The requirement to link the place of employment with the disease, by a "material degree" requires a petitioner to show the nexus by an "appreciable degree or a degree substantially greater than de minimis." Fiore v. Consol. Freightways, 140 N.J. 452, 474, 659 A.2d 436 (1995). The facts of the situation "in their totality must demonstrate causality by the greater weight of credible evidence." Dwyer v. Ford Motor Co., 36 N.J. 487, 494, 178 A.2d 161 (1962). Petitioner's burden is to show by a preponderance of the evidence that the link is probable. The petitioner need not prove that the nexus between the disease and the place of employment is certain. Laffey v. Jersey City, 289 N.J.Super. 292, 303, 673 A.2d 838 (App.Div.1996); Wiggins v. Port Auth., 276 N.J.Super. 636, 639, 648 A.2d 743 (App.Div.1994).
The Board asserts that the compensation judge exaggerated the pervasiveness and exclusivity of Magaw's smoke exposure and improperly found Magaw's exposure peculiar to his employment. The record reflects that Magaw's smoke exposure was virtually exclusively associated with Anderson. It is true that Anderson and Magaw also had a social relationship and did occasionally visit each other's houses. However, the record reflects that Magaw's second hand smoke exposure at work was regular and long standing and that Magaw attempted to avoid smoke from virtually every other source but Anderson. The record reflects that Magaw's outside of work exposure was de minimis compared to his work exposure.
The judge's calculation, which led to his finding that Anderson smoked approximately 46,800 cigarettes over the twenty-six year span, can be legitimately inferred from the record. The judge found Anderson smoked ten cigarettes a day, 180 days each school year for twenty-six years. Anderson testified to smoking one-half pack of cigarettes a day but other testimony could result in an even higher estimate. The judge's use of ten as an average daily total was not unreasonable on this record. The fact that the judge did not include holidays or sick days is in our opinion not determinative. There was no medical evidence presented which established any dose-response of second-hand smoke required to cause tonsil cancer. We read the judge's finding as merely an attempt at quantifying the amount of second-hand smoke which Anderson generated. Because the evidence supports a finding that Magaw was subjected at work to a considerable amount of second-hand smoke, we do not believe the exact finding is crucial, even if it were erroneous.
N.J.S.A. 34:15-30 and 34:15-31 require a petitioner to link his or her disease to causes arising out of the workplace which are peculiar to petitioner's place of employment. There is no requirement under the law that Magaw prove that physical education teachers have a higher degree of exposure to cigarettes than other school workers. In Fiore, supra, 140 N.J. at 470, 659 A.2d 436, the Supreme Court explained that a "teacher who develops asbestosis from working in a classroom with a flaking asbestos ceiling would be covered ...." under the law. Here, Magaw's exposure at his place of employment to a chain smoker compared with his efforts to minimize all other exposure, rendered smoke exposure at his place of employment peculiar or characteristic. His work exposure to smoke was constant, consistent and pervasive.
The most troublesome question presented by the Board is whether medical evidence supported the nexus between second-hand cigarette smoke and tonsil cancer. A petitioner claiming occupational disease "must show causes or conditions characteristic to the ... place of employment that substantially contributed in a material way to the disease." Id. at 472, 659 A.2d 436. As part of this burden, Magaw must prove by "suitable medical evidence" that second-hand smoke at his *1203 employment "did indeed cause or contribute" to his tonsil cancer. Id. at 473, 659 A.2d 436.
We acknowledge that compensation judges must be "particularly skeptical of expert testimony that supports or contests a finding of causation on the basis of reasoning inconsistent with prevailing medical standards." Hellwig v. J.F. Rast & Co., Inc., 110 N.J. 37, 54, 538 A.2d 1243 (1988). Compensation can not be justified when a medical witness merely asserts a "reasonably probable contributory work connection" with no medical support. Laffey, supra, 289 N.J.Super. at 306, 673 A.2d 838. The absence of any objective medical or scientific evidence establishing a causal link between petitioner's place of employment and a claimed occupational disease will usually be fatal to the petitioner's workers' compensation case. Wiggins, supra, 276 N.J.Super. at 644-45, 648 A.2d 743.
However, we believe that the evidence Magaw presented in this case was significantly different from the defective submissions we noted in Wiggins and Laffey. While the scientific data utilized to support Dr. Kornmehl's opinion were imperfect, we believe that her opinions were far from the sweeping generalizations based on virtually no documented medical authority which we criticized in Wiggins and Laffey.
Dr. Kornmehl treated Magaw and testified for him. As a board certified radiation oncologist, her credentials were relevant and impressive. Both experts who testified noted that specific scientific studies establishing a link between second-hand smoke and tonsil cancer were unavailable. But, this was not a case where the absence of medical evidence leads to an inference that the proposed medical theory was completely improbable or outlandish.
While courts obviously do not wish to decide cases based on discredited science or medicine, the judicial system does not have the leisure to defer decision until proper and definitive scientific or medical studies are available. That is why, for example, "in toxic-tort litigation, a scientific theory of causation that has not yet reached general acceptance may be found to be sufficiently reliable if it is based on a sound, adequately-founded scientific methodology involving data and information of the type reasonable relied on by experts in the scientific field." Rubanick v. Witco Chem. Corp., 125 N.J. 421, 449, 593 A.2d 733 (1991).
In this case, there was some related, objective medical evidence. The American Cancer Society's 1997 article Environmental Tobacco Smoke noted that "side stream smoke contains essentially all of the same carcinogenic (cancer-causing) and toxic agents that have been identified in the mainstream smoke inhaled by the smoker, but the concentrations in mainstream smoke are at greater levels." Da 66.
As noted in Eng-Huat Tan, M.D., David J. Adelstein, M.D., Mary Lynn T. Droughton, R.N., Marjorie A. Van Kirk, R.N., and Pierre Lavertu, M.D. Squamous Cell Head and Neck Cancer in Nonsmokers, 146 (1997), passive smoking or "exposure to environmental tobacco smoke is associated with a higher risk of lung cancer." Because of the small sample size, we agree that the squamous cell study is not definitive. But, we do not believe that we should completely disregard the study solely because only 10.2 % of the nonsmoking patients developed tonsil cancer compared with 9.3 % in the control group. The squamous cell study suggests that there is an "association between exposure to environmental smoke and squamous cell head and neck cancer in nonsmokers." Id. at 149.
Given, what is known about tobacco smoke, second-hand smoke and disease, Dr. Kornmehl's logical statement was in our opinion not a subjective guess or mere possibility. She testified that medicine knows that primary smoke causes lung, head and neck cancers and that secondary *1204 smoke causes lung cancers. While there are no definitive data which show that secondary smoke causes head and neck malignancies, by inference it makes sense that second-hand smoke would cause such malignancy. This is so especially under the facts of this case when her opinion is considered along with the other evidence indicating, for example, that alcohol and tobacco are the major risk factors in developing tonsil cancer, that Magaw hardly drank alcohol, and that Magaw's exposure to second-hand smoke at work was pervasive and continuing for twenty-six years.
Furthermore, our review of the findings and conclusions of a workers' compensation judge is limited. We will canvas the record and only decide whether the judge's findings could reasonably have been reached on sufficient credible evidence present in the record. We will also give due regard to the compensation judge's expertise and ability to evaluate witness credibility. Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965).
The Workers' Compensation Judge's determination that Magaw established a nexus between his disease and place of employment is based on sufficient evidence present in the record. The test is not certainty, Wiggins, supra, 276 N.J.Super. at 639, 648 A.2d 743; the evidence supporting the nexus appears "well founded in reason and logic ...." and is not mere guess or conjecture. Laffey, supra, 289 N.J.Super. at 303, 673 A.2d 838. We believe that the judge's conclusion on this record deserves to be affirmed.

II.
Besides finding that Magaw satisfactorily established compensability of his tonsil cancer, however, the compensation judge also directed that the Board should reinstate sick days which Magaw utilized and which were donated to Magaw by other employees from October 26, 1994 until September 7, 1996. The judge noted in the beginning of his decision, when speaking of stipulations that "It was also indicated that Mr. Magaw utilized accumulated sick time up until March 15, 1995, and thereafter he had not been receiving any pay." The Board argues that there is no statutory authority granted workers' compensation judges to reinstate sick days. Magaw argues that N.J.S.A. 34:15-12 provides the compensation judge authority to award temporary disability and that the judge's sick day reinstatement directive can be reasonably implied from the temporary disability authority.
The Division of Workers' Compensation, as an administrative agency, has only those powers which are conferred expressly by the Legislature or which can be reasonably implied from expressed powers. Young v. Western Electric Co., Inc., 96 N.J. 220, 225, 475 A.2d 544 (1984); Conway v. Mister Softee, 51 N.J. 254, 258, 239 A.2d 241 (1968). Where there is reasonable doubt as to the existence of the power, its authorization must be denied. Scaglione v. St. Paul-Mercury Indemnity Co., 46 N.J.Super. 363, 368, 134 A.2d 781 (App.Div.1957).
It is not clear what statutory authority the workers' compensation judge believed he was applying when he directed the Board to reinstate sick time. Certainly, there is no mention of sick leave in N.J.S.A. 34:15-12. The Legislature has included within the School Laws, however, various sick leave provisions that apply to school district personnel. N.J.S.A. 18A:30-1 to -8. These topics include, among other sections, a definition of sick leave, a provision detailing when sick leave is allowable and ways district employees can accumulate sick leave.
N.J.S.A. 18A:30-2.1, which was enacted in 1967, provides for payment of sick leave for service connected disability. This section provides in pertinent part:
Whenever any employee ... is absent from his post of duty as a result of a personal injury caused by an accident arising out of and in the course of his employment, his employer shall pay to such employee the full salary or wages *1205 for the period of such absence for up to one calendar year without having such absence charged to the annual sick leave or the accumulated sick leave provided in N.J.S. 18A:30-2 and 18A:30-3.... Any amount of salary or wages paid or payable to the employee pursuant to this section shall be reduced by the amount of any workmen's compensation award made for temporary disability.
The statute is meant to "complement workers' compensation benefits for a strictly limited time period." Theodore v. Dover Bd. of Educ., 183 N.J.Super. 407, 416, 444 A.2d 60 (App.Div.1982). Thus, the statute ensures that school employees receive full salary during temporary disability for up to one year. Whether N.J.S.A. 18A:30-2.1 applies only to "accidents" or whether it also applies to compensable occupational diseases appears not to have been decided.
Nevertheless, it is the Commissioner of Education who has "jurisdiction... [over] all controversies and disputes arising under the school laws." N.J.S.A. 18A:6-9. While the Commissioner will defer to a judge of compensation's temporary disability determination, it is the Commissioner of Education who usually decides whether and how the sick leave section, N.J.S.A. 18A:30-2.1, applies. Outland v. Monmouth-Ocean, 295 N.J.Super. 390, 685 A.2d 68 (App.Div.1996), certif. granted, 149 N.J. 141, 693 A.2d 110 (1997); Forgash v. Lower Camden County School, 208 N.J.Super. 461, 506 A.2d 356 (App.Div.1985); Tompkins v. Bd. of Educ. of Hamilton, 11 N.J.A.R. 520 (1986). The judge of compensation on the first day of this hearing apparently recognized this limitation. After he asked Magaw whether he was seeking reimbursement of sick time, Magaw's attorney replied that he was, if allowable. Thereafter the judge indicated "Well I can recommend it. I can't order it, I can recommend it ..."
Accordingly, given what appears to be a relatively comprehensive statutory delegation to the Commissioner of Education, N.J.S.A. 18A:30-1 to -8, and an absence of any express authority in the Workers' Compensation Act's temporary disability provision, N.J.S.A. 34:15-12(a), we believe that the Legislature intended that the Commissioner, rather than a judge of compensation, decide whether Magaw's sick leave should be reinstated. Therefore, we believe the Workers' Compensation judge exceeded his jurisdiction when he directed the Board to reinstate sick leave.
In this case, the Board should initially determine what effect the temporary disability determination would have on the sick leave Magaw utilized during the period that the workers' compensation judge determined Magaw should have received temporary disability. The Board's determination would then be subject to possible review by the Commissioner of Education.
Therefore, we affirm the compensability decision. We reverse and vacate the compensation judge's sick leave directives. Our reversal is without prejudice to Magaw's right to apply to the Board for sick leave reinstatement. If appeal to the Commissioner of Education is required, we take no position on the timeliness of such an appeal. N.J.A.C. 6:24-1.2(c).