796 A.2d 906 (2001)
350 N.J. Super. 590
Robert WOOLF, Petitioner-Respondent,
v.
CONSOLIDATED NDE, INC., Respondent-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 24, 2001.
Decided November 9, 2001.
*907 James A. McKenna, Toms River, argued the cause for appellant (Lomell Law Firm, attorneys; Mr. McKenna, on the brief).
Lee W. Shelly, Brielle, argued the cause for respondent.
Before Judges HAVEY, BRAITHWAITE and COBURN.
The opinion of the court was delivered by COBURN, J.A.D.
This is a workers' compensation occupational disease case involving a form of cancer called chronic mylogenous leukemia ("CML"). The judge of compensation determined that Robert Woolf, a radiographer, developed this cancer as a result of his long-term, daily, workplace exposure to radiation emitted by the x-ray equipment he operated for Consolidated NDE, Inc. ("NDE"). After a plenary hearing for interim relief, the judge entered an order granting Woolf temporary disability payments and medical treatment. NDE appeals, arguing that the judge's findings were unsupported by the evidence. We reject NDE's arguments and affirm the order.

I
NDE employed Woolf as a radiographer from 1978 to December 31, 1996. Since the job involved radiation exposure, NDE was licensed and regulated by the Nuclear Regulatory Commission ("NRC"). See 42 U.S.C.A. § 2134(b). There is no suggestion that NDE violated those regulations in any respect.
Throughout the entire course of his employment, Woolf's job consisted of using a uranium isotope camera that emitted gamma rays to x-ray welds. His radiation exposure was constantly monitored and recorded. Under the NRC regulations, an employee's annual maximum exposure was required to be less than 5 rems. See 10 C.F.R. § 20.1201(a)(1)(i). Woolf's highest annual exposure was 1.850 rems. For the 18 years of his employment, his permissible total would thus be 90 rems, while his actual exposure was 22.467 rems. As the *908 judge of compensation found, Woolf's "exposure both annually and cumulatively were a fraction of that permitted by the [NRC]." Nonetheless, on January 9, 1997, at age 53, he was diagnosed as having CML.
Woolf testified to the debilitating effects of the disease. Dr. Floyd Krengel's report, submitted to the judge and treated as if it had been marked in evidence, indicated that physically petitioner was "totally and permanently disabled." Dr. Robert S. Dengrove's report, treated similarly, stated that petitioner had "approximately 60 [percent] of total disability ... due to the combined neuropsychologic and neurological conditions...." No counter reports or testimony were submitted by NDE on those issues.
Dr. Lynda Mandell, a radiation oncologist and professor in the Department of Radiation Oncology and Pediatrics at Mount Sinai Medical Center in New York City, testified for Woolf based on a consideration of his history, medical records, a physical examination, and her review of the petitioner's radiation exposure records. She expressed the opinion that to a reasonable degree of medical certainty Woolf's "exposure over many years to radioactive absorption" caused his leukemia. When asked to give her reasons for reaching that conclusion, she had this to say:
We know that radiation in any form, whether it be radioactive or nonradioactive, can induce a malignant ... a process, a tumor, either malignant or benign. And we often see this ... even in therapeutic doses of radiation, where patients will develop a second malignancy.
[W]ith regard to leukemias, most specifically chronic myelogenous leukemia, acute chronic myelogenous leukemia and acute lymphoblastic leukemia, but more so the first two, the myelogenous series, we know from the atomic bomb survivors, and from the Chernobyl series although many of those patients did not live long enoughthat the absorption of radiation is significantly associated with these diseases.
When asked to cite any articles or treatises that would support her opinion, she referred to a 1982 book by "one of our major radiation pathologists" entitled Pathology of Radiation Injury, and then quoted one statement indicating that Japanese exposed to "total body radiation" during the bombings of Hiroshima and Nagasaki experienced "an increased incidence of various forms of leukemia...." She also referred to a another research paper dealing with the Japanese experience which said that there was a strong association between atomic bomb radiation and leukemia. At that point, the direct examination was concluded.
On cross-examination, Dr. Mandell conceded that gamma rays occur in nature and that there are many other forms of radiation to which people are exposed, as well, in their ordinary lives. She also agreed that leukemia occurs in the absence of unusual radiation exposure. She further acknowledged that statistical information relating particular exposures with CML would be helpful and that there were no studies of which she was aware that had linked radiography such as Woolf performed with an increased risk of CML. She also stated that there is a logical relationship between the extent of the dose and the occurrence of CML. She agreed that if petitioner had a "Philadelphia chromosome," which he does, he would have had a genetic predisposition for developing leukemia. On redirect, she agreed that the presence of that chromosome made it more likely that his workplace exposure to radiation would result in CML.
Both sides relied on a publication issued by the NRC's Office of Nuclear Regulatory *909 Research entitled Working Safely in Gamma Radiography, A Training Manual for Industrial Radiographers (September 1982). The relevant statements in the manual are as follows:
In fact, any amount of radiation you receive may increase your chances of developing cancer. For low doses of radiation, the risks are very small.
....
We don't know exactly what the chances are of dying of cancer because of a radiation dose, but we do have good estimates of the upper limit of the cancer risk. In fact, the estimates of cancer risk because of radiation exposure are probably more reliable than the estimates of cancer risk from any other hazardous material such as dangerous chemicals. This is because radiation has been studied more than any other hazardous material.
In the United States, one person in five dies of cancer. Most scientists would agree that for every one rem of radiation that a person receives, the chance of dying from cancer is increased by no more than one chance in 10,000. This means that each rem you receive during your lifetime adds 1 chance in 10,000 of cancer.

[Emphasis added.]
In a footnote to the above statement, the manual emphasizes that the chance of getting cancer from radiation exposure without dying from it is twice the chance of dying from it:
We must distinguish between the risk of getting cancer and the risk of dying of cancer. Of those who get cancer, roughly half die from the cancer. In this chapter we discuss the risk of dying from cancer. For every person who dies from a radiation-caused cancer, one other person would get a radiation-caused cancer, but would not die as a result of that cancer.
[Emphasis in original.]
Applying these statistics to this case, we gather that if 10,000 radiographers were exposed to the 22.467 rems received by Woolf, forty-five of them would probably develop cancer as a result of the exposure.
Dr. Frederick B. Cohen, a board certified internist with a subspeciality in medical oncology, testified for NDE. On direct examination, he expressed his opinion as follows:
The exposure that [Woolf] is said to have [experienced] as measured by his badge was much less than what is considered to be safe exposure.
....
Now since we know that the reason... we say what's safe is meant that ... your chances of getting leukemia are no greater than anybody else who was never exposed....
I have to say that my scientific mind says this patient's leukemia was not caused by this radiation.
Before expressing that opinion, Dr. Cohen noted what he considered to be the absence of epidemiological studies comparing the incidence of cancer in petitioner's occupation with "what would be expected in a normal population." He also observed that he was unaware of any evidence that "people who work in nuclear medicine have a higher incidence of disease."
On cross-examination, Dr. Cohen admitted that exposure to any radiation increases the risk of cancer. Although he had described the exposures allowed by the NRC as "safe," he conceded that the word actually used is "acceptable." In his view, the NRC manual was stating, in his words, "that the chances are that that [a] person exposed to that amount will notless than that amount[,] will not have a greater risk *910 of the disease than the average person." He also conceded, however, that a radiographer's risk of exposure was "greater than, yes, the general population."
He also agreed that a study of nuclear plant workers in the United States showed a higher incidence of leukemia than that in the general population; however, he noted that the studies in question did not state what the levels of exposure were. He then said, apparently contradicting his direct testimony:
There's no question that ... leukemia is probably more common in radiation in nuclear medicineor nuclear people than other cancers....
After which, he went on to say:
I mean, there's no question about it that leukemia is the ... primary disease that exposure to radiation causes.
The question is, Is there a safe level? Is there a level ... that people can be exposed to and not ... be at a higher risk to develop leukemia?
[W]hat we're talking about is whether or not peopleor else nobody should work in that field, I mean, or they should have better protection.
But the truth of the matter is we have decided there are levels that can be safe to which you should not get a higher incidence of leukemia.
He went on to admit that he was not sure of his assumption that the NRC permissible levels did not create a risk greater than that of the general population, but that he was nonetheless basing his opinion, at least in part, on that assumption.
Dr. Cohen also conceded that people of petitioner's age are more likely to develop cancer. Although he indicated that CML was not a rare disease, he stated that "one to two percent of the ... cancer population are leukemias" and that CML is "probably about ... 20 to 25 percent of those." Finally, on redirect examination, he noted that a death rate of "ten in a thousand ... [is] a high death rate."

II
Petitioner's action arises under section 31 of the Workers' Compensation Act ("the Act"), N.J.S.A. 34:15-1 to -128, which states in relevant part:
a. For purposes of this article, the phrase "compensable occupational disease" shall include all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment.

[N.J.S.A. 34:15-31.]
In Fiore v. Consolidated Freightways, 140 N.J. 452, 659 A.2d 436 (1995), the Court discussed at length the requirements of proof under this statute in the context of occupational heart disease. Since leukemia, like heart disease, may also be caused by natural, non-occupational circumstances, we believe Fiore provides the relevant legal standards for this case. Accordingly, petitioner was required to satisfy the three requirements described in Fiore:
To satisfy the standard, a petitioner claiming occupational heart disease must fulfill three requirements. First, as section 31 provides, the petitioner must show that the disease is due in "a material degree" to causes "arising out of the workplace and that are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment."
Second, the petitioner must prove "by suitable medical evidence that the employment exposure did indeed cause or contribute to the diseaseespecially in *911 the light of the competing claim of the smoking to be the causal agent." We doubt that the Legislature, when enacting section 7.2, contemplated that employers should compensate employees for coronary disease caused substantially by a lifetime of smoking or other personal-risk factors and immaterially by occupational exposure. Thus, a petitioner asserting an occupational heart-disease claim must show that the work exposure exceeds the exposure caused by the petitioner's personal-risk factors.
Third, the petitioner must show that the employment exposure substantially contributed to the development of the disease. An occupational exposure substantially contributes to the development of coronary-artery disease when the exposure is so significant that, without the exposure, the disease would not have developed to the extent that it caused the disability resulting in the claimant's incapacity to work.

[Id. at 472-73, 659 A.2d 436 (citations omitted).]
We are, of course, obliged to give due weight to the expertise of the compensation court judge and his evaluation of the credibility of the witnesses. Laffey v. City of Jersey City, 289 N.J.Super. 292, 303, 673 A.2d 838 (App.Div.1996), certif. denied, 146 N.J. 500, 683 A.2d 202 (1996) (citation omitted). Ultimately, the question on review, is whether the judge's findings are supported by sufficient credible evidence. Ibid.
In the context of the information provided by the NRC manual, together with other articles submitted for consideration, the judge found petitioner's expert to be more credible and persuasive than NDE's expert. That determination is supported by the evidence.
There is no question that petitioner was exposed to radiation in his workplace on a daily basis for eighteen years. Both experts agreed that radiation causes leukemia, and, indeed, Dr. Cohen described leukemia as the primary disease caused by radiation exposure, while admitting that any exposure increases the risk of getting the disease. Furthermore, he conceded that petitioner's exposure was "greater than [that of] the general population." Nonetheless, he still opined against causation primarily, we perceive, because the daily exposures were always less than those considered "acceptable" by the NRC and because he assumed, though he was not sure about it, that exposure to the NRC levels would not create a risk greater than that faced by the general public.
Dr. Cohen's assumption and, indeed, his ultimate opinion, appear to be inconsistent with his admission that petitioner received more radiation than a member of the general public would and with his further admission that increased exposure makes leukemia more likely. Furthermore, the NRC manual states that the chance of a radiographer getting cancer increases with each rem of radiation received. One may infer that if 10,000 radiographers received the total number of rems received by petitioner, forty-five of them probably would develop cancer.
It appears that petitioner's case, buttressed by the testimony of his expert, clearly satisfied the first two requirements of Fiore: the increased amount of radiation exposure was peculiar to his workplace and, at the least, it contributed to his contracting disease.
The real bone of contention between the parties is whether the workplace radiation "substantially contributed to the development of the disease." Fiore, supra, 140 N.J. at 473, 659 A.2d 436. In other words was "the exposure ... so significant that, without the exposure, the disease would *912 not have developed...." Ibid. Or, as the Court also put it, did the exposure cause or contribute to the disease to "`an appreciable degree or a degree substantially greater than de minimis.'" Id. at 474, 659 A.2d 436.
The core of NDE's argument is this. According to the NRC statistics, out of 10,000 people exposed to the extent suffered by petitioner, approximately forty-five would contract cancer, of whom approximately twenty-three would die. Since two thousand would probably die from cancer anyway, according to the manual, the suggestion is that the increased risk involved here should not be considered material because it represents a very small percentage compared to the total. And yet, NDE's expert admitted that a death rate of ten in a thousand would be medically significant, a "high death rate." Here, the projected death rate from the workplace exposure alone is almost three in a thousand and the rate of contracting the disease is almost five in a thousand.
Given those statistics, Dr. Cohen's view of what constitutes a medically significant death rate, and the inconsistencies in his testimony as contrasted with the entirely consistent testimony of Dr. Mandell, supported to some degree by the studies submitted to the judge, there appears to have been a substantial basis for the judge's determination that Woolf's workplace risk was appreciable and substantially greater than de minimis.[1] Furthermore, NDE's contention that the materiality of petitioner's exposure should be judged by comparing the NRC estimated rates to the overall cancer rate in the general population is inconsistent with Fiore. Rather the question is whether his exposure was in excess of that ordinarily encountered in everyday living. Fiore, supra, 140 N.J. at 460, 477, 659 A.2d 436. Both experts agreed that was the case here. Therefore, the third requirement of Fiore was satisfied.
NDE's remaining arguments, that Dr. Mandell's opinion was a "net opinion," and that petitioner failed to prove his disability and the necessity and reasonableness of his medical treatments, are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). However, we will comment briefly on the latter contention. Although the reports of Drs. Krengel and Dengrove were not formally marked in evidence, they were submitted to the judge as attachments to the motion for temporary benefits. Given their uncontested *913 findings, the petitioner's testimony regarding the onset of his disability and his present condition, the gravity of the disease, and the parties' focus at the hearings on the question of causation, we are satisfied that the judge properly determined the issues of disability and NDE's obligation for medical treatment. Moreover, we note that when NDE moved before the judge for a stay of his order, these issues were not even raised as grounds for the stay.
Affirmed.
NOTES
[1] In reaching that conclusion, the judge relied in part on two articles, brought to Dr. Cohen's attention during cross-examination, on which he commented as follows:

More important is P-10, an article entitled "Radiation and Mortality of Workers at Oak Ridge National Laboratory: Positive Associations for Doses Received at Older Ages" by the Department of Epidemiology, School of Public Health, University of North Carolina at Chapel Hill. That study examined the association between low-level exposure to ionizing radiation and mortality among workers at the Oak Ridge National Laboratory between 1943 and 1972. Association was observed between the low-level exposure to external ionizing radiation, the type at issue in this case, and mortality. The association was larger for doses received after 45 years of age. This comported with a study introduced as P-11 entitled "Age That Exposure Modifies the Effects of Low-Level Ionizing Radiation on Cancer Mortality In An Occupational Cohort [,]"... which also found the age at exposure modified the effects of external radiation doses on cancer mortality.
While these articles did not specify the dosages involved, as Dr. Cohen noted, they nonetheless provided further support for the judge's conclusion that the combination of petitioner's age at exposure, his genetic predisposition, and his exposure to more radiation than a person would ordinarily experience, warranted a determination that the exposure caused or substantially contributed to the development of the disease.